**WHITE MOTOR CORPORATION and White Farm Equipment Company, Appellants,**

v.

**E. I. MALONE, Commissioner of Labor and Industry for the State of Minnesota, Appellee.**

**No. 76–1266.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1976.

Decided Dec. 2, 1976.

---

Curtis L. Roy, Minneapolis, Minn., for appellants; Peter S. Hendrixson of Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., Frank C. Heath, John L. Strauch and James A. Rydzel of Jones, Day, Reavis & Pogue, Cleveland, Ohio, on brief.

James P. Gerlach, Sp. Asst. Atty. Gen., St. Paul, Minn., for appellee; Warren R. Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., and Richard S. Slowes, Sp. Asst. Atty. Gen., St. Paul, Minn., on brief.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

BRIGHT, Circuit Judge.

The question presented by this case is whether federal labor policy preempts the legislative power of the State of Minnesota to impose upon the White Motor Corporation [1] (White Motor) the obligation to fully fund its employee pension plan upon the closing of its factory and terminating its employees, notwithstanding an agreement to the contrary contained in the collective bargaining contract between White Motor and the employees' unions. The district court answered this preemption question in the negative [2] and denied White Motor injunctive relief barring enforcement of the questioned Minnesota legislation, referred to here as the Minnesota Pension Act.[3] We disagree, and hold that the Minnesota Pension Act, as applied to White Motor, is preempted by federal labor policy.

We have earlier considered other problems relating to White Motor's pension

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The district court described the organizational history of appellant White Motor, as follows: In 1962, White Motor organized a subsidiary, Minneapolis-Moline, Inc. Minneapolis-Moline, Inc. on January 1, 1963 acquired the assets of Motec Industries, Inc. (formerly called the Minneapolis-Moline Company) which had operated farm manufacturing plants at Hopkins, Minnesota and Minneapolis, Minnesota, on Lake Street. In 1969 Minneapolis-Moline, Inc. changed its name to

White Farm. White Farm still operates the Hopkins plant but closed the Lake Street plant in June, 1972. [*White Motor Corp. v. Malone*, 412 F.Supp. 372, 373 (D.Minn.1976).]

2. The district court opinion is reported as *White Motor Corp. v. Malone*, 412 F.Supp. 372 (D.Minn.1976).

3. The state statute involved in this litigation is the Private Pension Benefits Protection Act, ch. 437, §§ 1–18 (1974), Minn.Laws 2d Reg.Sess. 825–31.

plan.[4] The historical facts related there are a prelude to the present litigation. White Motor closed its Minneapolis factory and attempted to terminate as of June 30, 1972, the pension plan benefiting employees at the Minneapolis plant and employees at another White Motor factory in Hopkins, Minnesota. The UAW (Union) challenged the action contending that the pension plan could not be terminated prior to May 1, 1974, the expiration date of the collective bargaining agreement then in effect. An arbitrator ruled in favor of the Union, and the federal district court sustained the award as within the arbitrator's powers granted under terms of the collective bargaining agreement. On appeal, we affirmed. During that prior litigation, White Motor took appropriate action to terminate the pension plan as of May 1, 1974, if the arbitrator's determination should be sustained.[5]

During the pendency of the preceding litigation, the Minnesota legislature enacted the Minnesota Pension Act, effective April 10, 1974.[6] The statute requires full funding of pension benefits whenever an employer ceases to operate a place of employment or pension plan. The district court described

and interpreted the relevant statutory provisions as follows:

The title of the Act describes it as "[a]n act relating to private pensions; imposing an obligation upon certain employers who terminate pension plans; providing for the enforcement and method of payment of such obligations." Minn. Laws 1974, ch. 437.

Minn.Stat. §§ 181B.03–.06 impose a "pension funding charge" directly against any employer who ceases to operate a place of employment or a pension plan. Such charge shall be equal in amount to the vested and nonvested benefits described in the statutory provisions. These sections essentially provide that any employee who has completed ten or more years of credited service under a pension plan has, upon termination of that plan or of his place of employment, an automatically vested right to all pension benefits he would have received had the particular plan not been terminated or had the place of business not been closed.

Minn.Stat. §§ 181B.09–.12 provide that the Commissioner of Labor and Industry,

---

**4.** *International Union, UAW v. White Motor Corp.*, 505 F.2d 1193 (8th Cir. 1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975).

**5.** We observe that at a later date (June 5, 1975), White Motor and the Union entered into a new pension plan for the still-operating Hopkins plant.

**6.** Relevant statutory provisions read:

**181B.03 Pension refunding charge, vested benefits prior to pension benefits protection act.** Every employer who hereafter ceases to operate a place of employment or a pension plan within this state shall owe to his employees covered by sections 181B.01 to 181B.17 a pension funding charge which shall be equal to the present value of the total amount of vested pension benefits based upon covered service occurring before April 10, 1974 *of such employees of the employer* who have completed ten or more years of any covered service under the pension plan of the employer and whose vested pension benefits have been or will be forfeited because of the employer's ceasing to operate a place of employment or a pension plan, less the amount of such vested pension bene-

fits which are compromised or settled to the satisfaction of the commissioner as provided in *sections 181B.01 to 181B.17.*

**181B.04 Nonvested benefits prior to act.** Every employer who hereafter ceases to operate a place of employment or a pension plan within this state shall owe to his employees covered by sections 181B.01 to 181B.17 a pension funding charge which shall be equal to the present value of the total amount of nonvested pension benefits based upon service occurring before April 10, 1974 of such employees of the employer who have completed ten or more years of any covered service under the pension plan of the employer and whose nonvested pension benefits have been or will be forfeited because of the employer's ceasing to operate a place of employment or a pension plan, less the *amount of such nonvested pension benefits* which are compromised or settled to the satisfaction of the commissioner as provided in sections 181B.01 to 181B.17. [Private Pension Benefits Protection Act, ch. 437, §§ 3, 4 (1974), Minn.Laws 2d Reg.Sess. 828 (codified as Minn.Stat. §§ 181B.03, .04).]

after investigation, shall certify amounts owing by an employer. That certified amount is declared, under § 181B.11, to "be a lien upon the employer's assets." The pension funding charge is used to purchase an annuity payable to the employee when he reaches normal retirement age. [*White Motor Corp. v. Malone*, 412 F.Supp. 372, 375 (D.Minn.1976).]

Pursuant to applicable provisions of the Minnesota Pension Act, the State of Minnesota notified White Motor that the corporation owed a pension funding charge of $19,150,053. White Motor's obligations as to vesting and, particularly, as to funding under the pension plan differed significantly from obligations imposed on employers by the Minnesota Pension Act. The district court described the history of White Motor's plan and discussed the differences in obligations imposed on the employer by its plan, as compared to the statutory obligations under Minnesota law, as follows:

In 1950, a pension plan was established for the employees of the predecessor of White Farm [White Motor]. This pension plan was carried forward in some form in each of the subsequent years that collective bargaining agreements were entered into: 1954, 1959, 1962, 1965, 1968 and 1971. Since 1955, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and certain of its local unions (hereinafter collectively referred to as the "UAW") have been the bargaining representatives for production and maintenance employees and clerical employees at the Lake Street and Hopkins plants. Pension benefits resulting from collective bargaining agreements continued to increase after the purchase of Motec Industries by White Motor in 1963.

The 1971 version of the pension plan is the plan pertinent to this action. The 1971 plan contained a provision, first inserted in the 1968 plan, requiring the funding of unpaid past service liability. Unpaid past service liability is at any given time, the excess of the accrued liability of the pension fund over the

present value of the assets of the fund. The 1971 plan provided:

*Section 9.05*

The unfunded net deficiency as of January 1, 1971 shall be amortized over a thirty-five (35) year period from January 1, 1971. The deficiencies resulting from benefit increases effective January 1, 1972 and January 1, 1973 shall be funded uniformly over a thirty-five (35) year period from January 1, 1972 and January 1, 1973 respectively.

\* \* \* \* \* \*

In language unchanged since the 1950 pension plan, the 1971 plan provided for the payment of pensions as follows:

*Section 6.09—Source of Pensions*

Pensions shall be payable only from the Fund and rights to pensions shall be enforceable only against the Fund.

\* \* \* \* \* \*

*Section 6.17—No Other Benefits*

No benefits other than those specifically provided for are to be provided under this Plan. No employee shall have any vested right under the Plan prior to his retirement and then only to the extent specifically provided herein.

\* \* \* \* \* \*

*Section 9.04—Rights of Employees in the Fund*

No employees, participant or pensioner shall have any right to, or interest in, any part of any Trust Fund created hereunder, upon termination of employment or otherwise, except as provided under this Plan and only to the extent therein provided. All payments of benefits as provided for in this Plan shall be made only out of the Fund or Funds of the Plan and neither the Company nor any Trustee nor any Pension Committee or Member thereof shall be liable therefor in any manner or to any extent.

During the 1968 and 1971 negotiations with UAW, Pension Guarantees applicable to the Lake Street and Hopkins plants were given by White Motor. These Guarantees provided that, upon termina-

tion of the pension plan, benefits were guaranteed by White Motor at a designated benefit level. By giving the Guarantees, White Motor assumed a direct liability of approximately $7,000,000.

\* \* \* \* \* \*

At the time the Lake Street plant was closed, the pension fund was only partially funded and there was a net deficiency in the fund of approximately $14,000,000. [*White Motor v. Malone, supra,* 412 F.Supp. at 373–75 (footnote omitted).]

The Minnesota Pension Act obligations conflict with White Motor's pension plan provisions in the following respects: (1) the Act grants employees vested rights to pension benefits which are not available under the pension plan; (2) to the extent of any deficiency in the pension fund, the Act requires satisfaction of pension benefits from the general assets of the employer, while the pension plan provides that benefits shall be paid only out of the pension fund; and (3) the Act does not permit employers to escape liability for funding of pension rights, but the pension plan permits White Motor to terminate the plan at any time, and in so doing end any liability for future payments to the pension fund, save those specifically guaranteed. Thus, essential features of the pension plan, deferred funding of past service liability[7] coupled with limited employer liability and the power to terminate, were negated by the Pension Act.

The district court rejected White Motor's summary judgment motion for a declaration of invalidity of the Pension Act on preemption grounds, and for relief by way of a temporary injunction against its enforcement, reasoning that,

[t]he employer's duty to bargain in good faith over pensions is not altered by the Pension Act. The Pension Act does not require labor and management to

agree to a pension plan or that specific provisions be included in a pension plan.

The NLRA does not regulate the substantive terms of a collective bargaining agreement. \* \* \*

The danger addressed in [*San Diego Building Trades Council v.*] *Garmon* [359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)] is not presented by the facts of the present action. The state is not attempting to regulate a subject matter which lies within the exclusive competence of the National Labor Relations Board. The Pension Act does not

". . . regulate conduct so plainly within the central aim of federal regulation involv[ing] too great a danger of conflict between power asserted by Congress and requirements imposed by state law. . . ."

[*White Motor Corp. v. Malone, supra,* 412 F.Supp. at 379 (citations omitted).]

Additionally, the district court determined the preemption doctrine was inapplicable to pension plans, on the ground that Congress in the Welfare and Pension Plans Disclosure Act, Pub.L. No. 85–836, 72 Stat. 997 (1958) (codified at 29 U.S.C. § 301 *et seq.*), as amended, explicitly recognized state power over pension plan "operation" or "administration." In that regard the district court wrote:

Congress expressly provided that states should remain free to become involved in the regulation of pension plans when it stated:

The provisions of this chapter . . shall not be held to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law . . . of any State affecting the operation or administration of employee . . . pension benefit plans. . . .

---

7. The district court noted that deferred funding of past service liability is a common feature of pension plans. In essence, past service liability is met during continuing business operations by the employer's continuing contributions to the pension fund. If the plan is terminated, the pension fund becomes fixed and pension obli-

gations remain partially unfunded. The district court also noted that in the 1971 collective bargaining agreement the parties had agreed to amortize the unfunded deficiency over the next 35 years. *White Motor Corp. v. Malone, supra,* 412 F.Supp. at 374.

29 U.S.C. § 309(b).

The legislative history of the Pension Disclosure Act further emphasizes the regulatory power retained by the states. The Senate Report stated:

.  .  .  [The Pension Disclosure Act] is a disclosure statute and by design endeavors *to leave regulatory responsibilty to the States.*

\*      \*      \*      \*      \*      \*

.  .  .  It is designed to place the primary responsibility for the policing and improved operations of these plans upon the participants themselves, with a minimum of interference in the natural development and operation of such plans, *to leave to the States the detailed regulations relating to insurance, trusts, and other phases of their operations,* and to place the least possible burden by way of costs and otherwise upon the plans and upon the Federal Government. [emphasis added]

S.Rep. No. 1440, 85th Cong., 2d Sess. (1958), 1958 *U.S. Code Cong. and Adm. News* 4137, 4153–4154.

Moreover, Congress was specifically aware that pension plans were often the product of the collective bargaining process. *See, e. g.,* S.Rep. No. 1440, 85th Cong., 2d Sess. (1958), 1958 U.S. Code Cong. and Adm. News 4137, 4143–4144; H.Rep. No. 2283, 85th Cong., 2d Sess. (1958), 1958 *U.S. Code Cong. and Adm. News* 4181, 4188–4189. Thus Congress was not unmindful that it was permitting States to regulate a subject matter which was the product of collective bargaining. [*White Motor Corp. v. Malone, supra,* 412 F.Supp. at 380–81.]

We disagree.

The Minnesota Pension Act directly intrudes upon the employer's substantive obligations under the pension plan, obligations arrived at freely through collective bargaining, and appears in its operation to be a unique legislative act. The Supreme Court's holdings and decisions in the area of federal labor law preemption require reversal.

■ Section 7 of the National Labor Relations Act (29 U.S.C. § 157) establishes the right of employees to form and join labor organizations and to bargain collectively through representatives of their own choosing. Sections 8(a)(5), 8(b)(3), and 8(d) of the National Labor Relations Act, as amended (29 U.S.C. §§ 158(a)(5), 158(b)(3), and 158(d)), require employers and labor organizations to bargain in good faith with respect to "wages, hours, and other terms and conditions of employment  \*  \*  \*." Pension plans fall within the category of "wages, hours, and other terms and conditions of employment," and are therefore mandatory subjects of bargaining under the National Labor Relations Act. *Inland Steel Co. v. NLRB,* 170 F.2d 247 (7th Cir. 1948), *cert. denied,* 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949).

Congress, in enacting the NLRA, refrained from specifying those aspects of labor relations which are not subject to state interference. Thus, a considerable body of law has developed in which the courts have determined when state action affecting collective bargaining is impermissible. The United States Supreme Court recently reviewed and discussed these cases in *Lodge 76, Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

Mr. Justice Brennan, speaking for the majority of the Court, noted the general division of cases into two categories:

Cases that have held state authority to be pre-empted by federal law tend to fall into one of two categories: (1) those that reflect the concern that "one forum would enjoin, as illegal, conduct which the other forum would find legal" and (2) those that reflect the concern "that the [application of state law by] state courts would restrict the exercise of rights guaranteed by the Federal Acts." [*Machinists, supra,* 427 U.S. at 138, 96 S.Ct. at 2552 (citation omitted).]

The decision in *Machinists* focused on the second category. The Wisconsin Employment Relations Commission had ordered a union to cease and desist from "authorizing,

encouraging or condoning any considered refusal to accept overtime assignments" from the employer after the termination of the previous collective bargaining agreement, and during negotiations for a new agreement, and the Wisconsin courts had entered a judgment enforcing the Commission's order.[8] The *Machinists* appeal to the Supreme Court presented the question whether federal labor policy preempted the authority of the state Labor Relations Board to enjoin a union and its members from refusing to work overtime in order to put economic pressure on the employer in negotiations for renewal of an expired collective bargaining agreement. The Court deemed this controversy as falling into the second line of preemption cases, *i. e.,* those "focusing upon the crucial inquiry whether Congress intended that the conduct involved be unregulated because 'left to be controlled by the free play of economic forces.'" *Machinists, supra,* 427 U.S. at 140, 96 S.Ct. at 2553.

The Wisconsin Supreme Court in upholding the injunction had relied on the so-called *Briggs-Stratton* case, *Local 232 Automobile Workers v. Wisconsin Board,* 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949). *Briggs-Stratton* held that state power was not preempted as to peaceful conduct neither protected by § 7 nor prohibited by § 8 of the Act, a holding premised on the statement that "[t]his conduct is either governable by the state or it is entirely ungoverned." *Machinists, supra,* 427 U.S. at 141, 96 S.Ct. at 2553, quoting *Briggs-Stratton, supra,* 336 U.S. at 254, 69 S.Ct. 516. The *Machinists* opinion observed that the underpinning of *Briggs-Stratton* had been undercut by subsequent decisions of the Court

[f]or the Court soon recognized that a particular activity might be "protected" by federal law not only where it fell within § 7, but also when it was an activity that Congress intended to be "unrestricted by *any* governmental power

to regulate" because it was among the permissible "economic weapons in reserve . . . . actual exercise [of which] on occasion by the parties is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." *NLRB v. Insurance Agents,* 361 U.S. [477] at 488, 489, 80 S.Ct. [419] at 426, 427 [4 L.Ed.2d 454] (emphasis added). [*Machinists, supra,* 427 U.S. at 141, 96 S.Ct. at 2553–54.]

The *Machinists* decision expressly overruled the *Briggs-Stratton* decision as having been worn away by contrary authority. *Machinists, supra,* 427 U.S. at 154, 96 S.Ct. at 2560.

The *Machinists* case and the cases relied on in *Machinists*[9] considered the power of states to regulate conduct by employers and employees constituting economic weapons used in the collective bargaining process. The *Machinists* opinion deemed the Court's earlier decision in *NLRB v. Insurance Agents,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), as substantial precedent for overruling *Briggs-Stratton.* In *Insurance Agents,* on-the-job activities by union members interfered with the employer's business, and thus put economic pressure on the employer to accede to the union's bargaining demands. The NLRB held that proof of these tactics justified its determination that the union had failed to bargain in good faith as required by § 8(b)(3) of the NLRA. The Supreme Court disagreed:

[A]part from this essential standard of conduct [good faith], Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences.

\* \* \* \* \* \*

[I]f the Board could regulate the choice of economic weapons that may be used as part of collective bargaining, it would be in a position to exercise considerable influence upon the substantive terms on which the parties contract. As the par-

---

**8.** *Lodge 76 Machinists v. Wisconsin Employment Relations Commission,* 67 Wis.2d 13, 226 N.W.2d 203 (1975).

**9.** *See* cases cited at *Machinists, supra,* 427 U.S. 145, 96 S.Ct. at 2555.

ties' own devices became more limited, *the Government might have to enter even more directly into the negotiation of collective agreements. Our labor policy is not presently erected on a foundation of government control of the results of negotiations.* [*Insurance Agents, supra,* 361 U.S. at 488, 490, 80 S.Ct. at 426 (emphasis added).]

■ *Machinists,* in its review of pertinent Supreme Court cases,[10] makes it abundantly clear that neither the states nor the National Labor Relations Board may attempt to influence the substantive terms of collective bargaining agreements by regulating the conduct of the parties to collective bargaining negotiations. These agreements are to be controlled by and left to the free play of economic forces. If states cannot control the economic weapons of the parties at the bargaining table, *a fortiori,* they may not directly control the substantive terms of the contract which results from that bargaining.

Appellant in seeking reversal relies heavily on *Local 24, Teamsters v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959). *Oliver* holds that by reason of the preemption doctrine, a state antitrust statute cannot apply to negate terms of a collective bargaining agreement setting wage rates. In that case, a collective bargaining agreement between a group of labor unions and a group of interstate motor carriers prescribed a wage scale for truck drivers and, in order to prevent evasion thereof, provided that truck owner-drivers should be paid, in addition to the prescribed wage, not less than a specified minimum rental for the use of their vehicles. Respondent Oliver, a truck owner-driver member of the union had obtained an injunction in the state court, affirmed by the Ohio Supreme Court, to prevent the motor carriers and the local union from carrying out the minimum rent provision on the ground that such term of the collective bargaining agreement violated Ohio antitrust laws. The Supreme Court reversed. The state antitrust law could not be applied to bar the contracting parties from carrying out of the terms of a collective bargaining agreement upon a subject as to which federal law directed them to bargain. The Court said:

We must decide whether Ohio's antitrust law may be applied to prevent the contracting parties from carrying out their agreement upon a subject matter as to which federal law directs them to bargain. Little extended discussion is necessary to show that Ohio law cannot be so applied. * * * The goal of federal labor policy, as expressed in the Wagner and Taft-Hartley Acts, is the promotion of collective bargaining; to encourage the employer and the representative of the employees to establish, through collective negotiation, their own charter for the ordering of industrial relations, and thereby to minimize industrial strife. See *Labor Board v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893; *Labor Board v. American National Ins. Co.,* 343 U.S. 395, 401–402, 72 S.Ct. 824, 828, 96 L.Ed. 1027. Within the area in which collective bargaining was required, Congress was not concerned with the substantive terms upon which the parties agreed. * * * [*Oliver, supra,* 358 U.S. at 295, 79 S.Ct. at 304.]

Specifically focusing on the threatened impact of the state law on the collective bargaining process, the court said:

To allow the application of the Ohio antitrust law here would wholly defeat the full realization of the congressional purpose. The application would frustrate the parties' solution of a problem which Congress has required them to negotiate in good faith toward solving, and in the solution of which it imposed no limita-

---

**10.** *See* cases cited in *Machinists, supra,* 427 U.S. at 145, 96 S.Ct. at 2555–59. We, of course, here are not concerned with certain aspects of labor relations which courts have recognized as falling within the police power of the states, such as actual or threatened vio- lence to persons, or destruction of property, or where the activity regulated is of peripheral concern to federal labor relations policy. *See Machinists, supra,* 427 U.S. at 136, 96 S.Ct. at 2551, notes 2 and 3.

tions relevant here. Federal law here created the duty upon the parties to bargain collectively; Congress has provided for a system of federal law applicable to the agreement the parties made in response to that duty * * *; and federal law sets some outside limits (not contended to be exceeded here) on what their agreement may provide * * *. We believe that there is no room in this scheme for the application here of this state policy limiting the solutions that the parties' agreement can provide to the problems of wages and working conditions. * * * Since the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State. * * * The solution worked out by the parties was not one of a sort which Congress has indicated may be left to prohibition by the several States. * * We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the federally sanctioned agreement and state policy which seeks specifically to adjust relationships in the world of commerce. If there is to be this sort of limitation on the arrangements that unions and employers may make with regard to these subjects, pursuant to the collective bargaining provisions of the Wagner and Taft-Hartley Acts, it is for Congress, not the States, to provide it. [*Oliver, supra,* 358 U.S. at 295–97, 79 S.Ct. at 304 (citations omitted).]

The district court rejected *Oliver* as dispositive in this case, stating:

> Plaintiffs assert that a state's attempt to regulate a subject matter of collective bargaining, such as employee pensions, should not be permitted where that regulation conflicts with the collective bargaining agreement.
>
> *      *      *      *      *      *

State antitrust statutes present unique problems in the area of labor preemption. The Supreme Court has consistently held that the NLRA precludes their application to appropriate labor union activities. *See, e. g., Connell Construction Co. v. Plumbers & Steamfitters,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *Weber v. Anheuser-Busch, Inc.,* 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955). Antitrust laws are designed primarily to apply to business combinations and their application to collective action by employees would produce a direct conflict with the national labor policy.

The Court has stated that:

> [p]ermitting state antitrust law to operate in [the labor] field could frustrate the basic federal policies favoring employee organization and allowing elimination of competition among wage earners, and interfere with the detailed system Congress has created for regulating organizational techniques.

*Connell, supra,* 421 U.S. at 636, 95 S.Ct. at 1842, 44 L.Ed.2d at 434.

The inherent conflict and delicate balance which exists between labor and antitrust policy does not exist between labor policy and the regulation of pensions. Congress, in formulating its policies, has indicated that states may regulate pensions. Accordingly, the court concludes that the Minnesota Pension Act does not necessarily stand as an obstacle to the accomplishment of the purposes and objectives of Congress. The broad language of *Oliver* does not require the striking down of the Pension Act. [*White Motor Corp. v. Malone, supra,* 412 F.Supp. at 381.]

■ In our view, *Oliver* is not to be read so restrictively. We emphasize the Court's language:

> We believe there is no room in this scheme [of federal labor law] for the application here of the state policy limiting the solutions that parties' agreement can provide to the problems of wages and working conditions. [*Oliver, supra,* 358 U.S. at 296, 79 S.Ct. at 305.]

Moreover, in *Labor Board v. Insurance Agents,* the Court cited *Oliver* in support of the following statement:

But apart from this essential standard of conduct, Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences. See *Teamsters Union v. Oliver, supra,* 358 U.S. at 295, 79 S.Ct. [297] at page 304. [*Insurance Agents, supra,* 361 U.S. at 488, 80 S.Ct. at 426.]

The Supreme Court in *Machinists* also relied on specific language in *Oliver* as a basis for overruling *Briggs-Stratton.*

Our decisions since *Briggs-Stratton* have made it abundantly clear that state attempts to influence the substantive terms of collective-bargaining agreements are as inconsistent with the federal regulatory scheme as are such attempts by the NLRB: "[s]ince the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State." *Local 24 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L.–C.I.O v. Oliver,* 358 U.S. 283, 296, 79 S.Ct. 297, 305 * * * (1959). [*Machinists, supra,* 427 U.S. at 153, 96 S.Ct. at 2559.]

Thus, *Oliver* stands for the general proposition that a state cannot modify or change an otherwise valid and effective provision of a collective bargaining agreement.

■ Finally, we turn to the district court determination that the federal Welfare and Pension Plans Disclosure Act, Pub.L. No. 85–836, 72 Stat. 997 (1958) (codified at 29 U.S.C. § 301 *et seq.*) (Disclosure Act), expressly authorizes substantive state regulation of pension plans. The statutory language relied on by the district court is as follows:

The provisions of this chapter * * * shall not be held to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of the United States or of any State affecting the operation or administration of employee, welfare, or pension benefit plans, or in any manner to authorize the operation or administration of such plan contrary to any such law. [29 U.S.C. § 309(b).] [11]

Neither this language nor statutory history suggests that Congress intended to regulate substantive provisions, performance of, or the funding of any employee benefit plan or to authorize such regulation by the states.

The express statutory language relied upon by the district court applies to duties and liabilities, civil or criminal, imposed upon persons operating and administering employee welfare or pension benefit plans to conserve and keep safe those funds. The legislative history emphasizes the limited purpose of this legislation and that the Act's provisions do not affect substantive terms of employee benefit plans. We turn to the Senate Report as the Senate Bill was passed in lieu of the House Bill. *See* 3 U.S. Code Cong. & Adm. News p. 4137 (1958). That Senate Report, in part, reads:

Complete disclosure of the details of welfare and pension plan operations provides the most effective single deterrent against abuses and the many other weaknesses of these plans. It would provide the greatest incentive to good management and investment policies and the best protection to the interests and rights of employees, employers, and the Government alike. [*Id.* at p. 4153.]

11. The Welfare & Pension Plans Disclosure Act has been superseded by the Employee Retirement Income Security Act (ERISA), a comprehensive pension reform law enacted on September 2, 1974. The ERISA specifically repealed the Pension Disclosure Act, 29 U.S.C. § 1031, and replaced it with new reporting and disclosure provisions. 29 U.S.C. §§ 1021–1031. The district court noted:

ERISA also sought to avoid all future questions of preemption by specifically providing for the superseding of all state laws relating to employee benefit plans. 29 U.S.C. § 1144. Since ERISA with its preemption provision was enacted after the occurrences which give rise to the present case before the court, plaintiffs have not sought to avail themselves of any of its provisions of legislative history. [*White Motor Corp. v. Malone, supra,* 412 F.Supp. at 380 n. 6.]

In further discussion of the principles and purposes of the Senate Bill, the Report adds:

S. 2888 provides for registration, reporting, and disclosure of the financial operations of all types of private employee welfare and pension benefit plans. It is designed to place the primary responsibility for the policing and improved operations of these plans upon the participants themselves, with a minimum of interference in the natural development and operation of such plans, to leave to the States the detailed regulations relating to insurance, trusts, and other phases of their operations, and to place the least possible burden by way of cost and otherwise upon the plans and upon the Federal Government. It is the policy of this bill to protect the revenues of the United States, the interests of participants in the plans, their beneficiaries, the employers and the public, and to conserve the moneys involved so as to assure their utilization for their intended purposes.

The bill would give the employee-beneficiaries of these plans an accounting for the money they spend and which is spent in their behalf for future security benefits and permits them to appraise the merits of these plans, which in many cases are held out to them as a competitive inducement of employment. It would give the employee-beneficiaries protections comparable to those provided in other large-scale investment operations. It is designed to deter dishonesty, mismanagement, and waste by allowing public scrutiny of the financial operations of such plans, and it accomplishes disclosure of the finances of these plans in one operation for all purposes. [*Id.* at pp. 4154–55.]

Additionally, the report discusses criminal penalties and, in that discussion, expressly negates any purpose of the enactment to regulate substantive provisions:

Although making no attempt to regulate employee-benefit plans, the bill, in addition to the necessary authority to the Secretary of Labor to enforce the administration of the legislation, provides severe criminal sanctions for willful, false statements, the destruction of records, embezzlement, kickbacks, and other self-dealing. [*Id.* at p. 4157.]

Clearly, the preemption disclaimer provision of the Disclosure Act, § 309(b), relates to state statutes governing those obligations of trust undertaken by persons managing, administrating, or operating employee benefit funds, the violation of which gives rise to civil and criminal penalties. Accordingly, no warrant exists for construing this legislation to leave to a state the power to change substantive terms of pension plan agreements.

The construction to the contrary pressed upon us by the appellee would turn upside down well-established labor law principles.

An appreciation of the true character of national labor policy expressed in the NLRA and LMRA indicates that in providing a legal framework for union organization, collective bargaining, and the conduct of labor disputes, Congress struck a balance of protection, prohibition, and laissez faire in respect to union organization, collective bargaining, and labor disputes that would be upset if a state could also enforce statutes or rules of decision resting upon its views concerning accommodation of the same interests. [Cox, *Labor Law Preemption Revisited,* 85 Harv.L.Rev. 1337, 1352 (1972).]

The economic travail suffered by retirees of the former Minnesota Moline Company plant in Minneapolis, Minnesota, did not result from misapplication, misappropriation, or misuse of any pension trust funds. The employees' expectation of pension benefits remained subject to change by reason of changing economic conditions, because the employer reserved the right to terminate the plan. Blame cannot be attached to either the Union or the employer for the changed economic conditions which resulted in the closing of the Lake Street plant and the termination of the pension plan. The parties (union and employer) agreed upon a pension plan that was never fully funded,

or otherwise guaranteed. We presume that the parties agreed to increase current wages, perhaps at the expense of adequately funding retirement benefits.

If the legislative solution presented here can be sustained, then in another day a differently-minded state legislature could take away from working people contract benefits obtained through hard, fair bargaining. We construe national labor policy to mandate "hands off" by the states in this area of labor relations.

We reverse and remand for the entry of judgment in conformity with this opinion.