## MALONE, COMMISSIONER OF LABOR AND INDUSTRY FOR MINNESOTA *v.* WHITE MOTOR CORP. ET AL.

No. 76–1184. Argued January 10, 1978—Decided April 3, 1978

WHITE, J., delivered the opinion of the Court, in which MARSHALL, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., *post*, p. 515, and POWELL, J., *post*, p. 516, filed dissenting opinions, in which BURGER, C. J., joined. BRENNAN and BLACKMUN, JJ., took no part in the consideration or decision of the case.

*Richard B. Allyn,* Solicitor General of Minnesota, argued the cause for appellant. With him on the briefs were *Warren Spannaus,* Attorney General, and *Kent G. Harbison, Richard A. Lockridge,* and *Jon K. Murphy,* Special Assistant Attorneys General.

*Frank C. Heath* argued the cause for appellees. With him on the brief were *Curtis L. Roy, Erwin Griswold,* and *John L. Strauch.*

*Allan A. Ryan, Jr.,* argued the cause for the United States

as *amicus curiae* urging reversal. On the brief were *Solicitor General McCree, John S. Irving, Carl L. Taylor, Norton J. Come, Linda Sher,* and *David S. Fishback.**

MR. JUSTICE WHITE delivered the opinion of the Court.

A Minnesota statute, the Private Pension Benefits Protection Act, Minn. Stat. § 181B.01 *et seq.* (1976) (Pension Act), passed in April 1974, established minimum standards for the funding and vesting of employee pensions. The question in this case is whether this statute, which since January 1, 1975, has been pre-empted by the federal Employee Retirement Income Security Act of 1974 (ERISA),[1] was pre-empted prior to that time by federal labor policy insofar as it purported to override or control the terms of collective-bargaining agreements negotiated under the National Labor Relations Act (NLRA). A Federal District Court held that it was not, 412 F. Supp. 372 (Minn. 1976), but the Court of Appeals for the Eighth Circuit disagreed and held the Pension Act invalid. 545 F. 2d 599 (1976). Because the case fell within our mandatory appellate jurisdiction pursuant to 28 U. S. C. § 1254 (2), we noted probable jurisdiction. 434 U. S. 813. We reverse.

I

In 1963, White Motor Corp. and its subsidiary, White Farm Equipment Co. (hereafter collectively referred to as appellee),

---

*Peter G. Nash, Eugene B. Granof,* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging affirmance.

*J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae.*

[1] ERISA, 88 Stat. 832, 29 U. S. C. § 1001 *et seq.* (1970 ed., Supp. V), provides for comprehensive federal regulation of employee pension plans, and contains a provision expressly pre-empting all state laws regulating covered plans. § 1144 (a) (1970 ed., Supp. V). Because ERISA did not become effective until January 1, 1975, and expressly disclaims any effect with regard to events before that date, it does not apply to the facts of this case.

purchased from another company two farm equipment manufacturing plants, located in Hopkins, Minn., and Minneapolis, Minn. (on Lake Street). The employees at these plants, represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), were covered by a pension plan established through collective bargaining.

Under the 1971 collective-bargaining contract, the Pension Plan provided that an employee who attained the age of 40 and completed 10 or more years of credited service with the company was entitled to a pension. The amount of the pension would depend upon the age at which the employee retired. In language unchanged since 1950, the 1971 Plan provided that "[p]ensions shall be payable only from the Fund, and rights to pensions shall be enforceable only against the Fund." App. 155.[2] The Plan, however, was to be funded in part on a deferred basis. The unpaid past service liability—the excess of accrued liability over the present value of the assets of the Fund—was to be met through contributions by the employer from its continuing operations.[3]

---

[2] Section 6.17 of the Plan also stated:

"No benefits other than those specifically provided for are to be provided under this Plan. No employee shall have any vested right under the Plan prior to his retirement and then only to the extent specifically provided herein." App. to Jurisdictional Statement A–29.

Section 9.04, "Rights of Employees in Fund," is also relevant:

"No employee, participant or pensioner shall have any right to, or interest in any part of any Trust Fund created hereunder, upon termination of employment or otherwise, except as provided under this Plan and only to the extent therein provided. All payments of benefits as provided for in this Plan shall be made only out of the Fund or Funds of the Plan, and neither the Company nor any Trustee nor any Pension Committee or Member thereof shall be liable therefore in any manner or to any extent." App. to Jurisdictional Statement A–7.

[3] The 1971 version of the Plan contained a provision which required the employer to fund the net deficiency over a period of 35 years, beginning

Section 10.02 of the Plan provided that "[t]he Company shall have the sole right at any time to terminate the entire plan." During the 1968 and 1971 negotiations, however, the UAW obtained from appellee guarantees that, upon termination, pensions for those entitled to them would remain at certain designated levels, though lower than those specified in the Plan.[4] By virtue of these guarantees, appellee assumed a direct liability for pension payments amounting to $7 million above the assets in the Fund.

Appellee exercised its contractual right to terminate the Pension Plan on May 1, 1974.[5] A few weeks before, however, the Pension Act had been enacted. This statute imposed "a pension funding charge" directly against any employer who ceased to operate a place of employment or a pension plan. This charge would be sufficient to insure that all employees with 10 or more years of service would receive whatever pension benefits had accrued to them, regardless of whether their rights to those benefits had "vested" within the terms of

---

in 1971. The 1968 version contained a similar provision which contemplated that the deficiency would be amortized over a 30-year period.

[4] The effect of the guarantees was to assure that the employees would receive pension benefits at a level about 60% of that specified in the Plan.

[5] In January 1972, after several years of losses, appellee informed the UAW that it intended to close both of the plants at issue. As a result of negotiations, the Hopkins plant continued to operate, but the Lake Street plant was closed. At the time the Lake Street plant was closed, there was a net deficiency in the Pension Fund of $14 million. As of January 1, 1975, there were 981 retirees under the Plan and 233 persons eligible for deferred pensions. In addition, there were 44 terminated employees who at the time of the termination had 10 years of service but had not attained the age of 40. Two hundred and sixty employees continued to work at the Hopkins plant.

Appellee also attempted to terminate the Pension Plan on June 30, 1972, but the UAW challenged this action on the ground that the Plan could not be terminated until expiration of the collective-bargaining agreement on May 1, 1974. An arbitrator upheld the union's position. See *International Union, UAW* v. *White Motor Corp.*, 505 F. 2d 1193 (CA8 1974).

the Plan. The funds obtained through the pension funding charge would then be used to purchase an annuity payable to the employee when he reached normal retirement age. Although the Pension Act did not compel an employer to adopt or continue a pension plan, it did guarantee to employees with 10 or more years' service full payment of their accrued pension benefits.

Pursuant to the Pension Act, the appellant, Commissioner of Labor and Industry of the State of Minnesota, undertook an investigation of the pension plan termination here involved and later certified that the sum necessary to achieve compliance with the Pension Act was $19,150,053. Under the Pension Act, a pension funding charge in this amount became a lien on the assets of appellee. Appellee promptly filed this suit in Federal District Court.

Appellee's complaint, as amended, asserted violations of the Supremacy Clause, the Contract Clause, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution. The Supremacy Clause claim was based on the argument that the Pension Act was in conflict with several provisions of the NLRA,[6] as amended, 29 U. S. C. § 151 et seq., because it "interferes with the right of Plaintiffs to free collective bargaining under federal law and . . . vitiates collective bargaining agreements entered into under the authority of federal law, by imposing upon Plaintiffs obligations which, by the express terms of such collective bargaining agreements, Plaintiffs were not required to assume." App. A–9—A–10. Appellee moved for partial summary judgment or, alternatively, for a preliminary injunction based on the pre-emption claim.

Distinguishing *Teamsters* v. *Oliver*, 358 U. S. 283 (1959), and relying on evidence of congressional intent contained in

---

[6] The complaint claimed a conflict with the provisions and policies of §§ 1, 7, 8 (a) (5), 8 (b) (3), and 8 (d) of the NLRA, 29 U. S. C. §§ 151, 157, 158 (a) (5), 158 (b) (3), and 158 (d).

the federal Welfare and Pension Plans Disclosure Act (Disclosure Act), 72 Stat. 997, as amended, 76 Stat. 35, 29 U. S. C. § 301 *et seq.,* the District Court held that the Pension Act was not pre-empted by federal law. 412 F. Supp. 372 (Minn. 1976). On appeal, the Court of Appeals for the Eighth Circuit held that the Pension Act was pre-empted by federal labor law, and reversed the District Court. 545 F. 2d 599 (1976). The reason was that the Pension Act purported to override the terms of the existing pension plan, arrived at through collective bargaining, in at least three ways: It granted employees vested rights not available under the pension plan; to the extent of any deficiency in the pension fund, it required payment from the general assets of the employer, while the pension plan provided that benefits shall be paid only out of the pension fund; and the Pension Act imposed liability for post-termination payments to the pension fund beyond those specifically guaranteed. This, the court ruled, the State could not do; for if, under *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132 (1976), "states cannot control the economic weapons of the parties at the bargaining table, *a fortiori,* they may not directly control the substantive terms of the contract which results from that bargaining." 545 F. 2d, at 606. Further, as the court understood the opinion in *Oliver, supra,* "a state cannot modify or change an otherwise valid and effective provision of a collective bargaining agreement." 545 F. 2d, at 608. Finally, the Court of Appeals found that the pre-emption disclaimer in the Disclosure Act relied on by the District Court related only

> "to state statutes governing those obligations of trust undertaken by persons managing, administrating or operating employee benefit funds, the violation of which gives rise to civil and criminal penalties. Accordingly, no warrant exists for construing this legislation to leave to a state the power to change substantive terms of pension plan agreements." *Id.,* at 609.

## II

It is uncontested that whether the Minnesota statute is invalid under the Supremacy Clause depends on the intent of Congress. "The purpose of Congress is the ultimate touchstone." *Retail Clerks* v. *Schermerhorn,* 375 U. S. 96, 103 (1963). Often Congress does not clearly state in its legislation whether it intends to pre-empt state laws; and in such instances, the courts normally sustain local regulation of the same subject matter unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States. *Ray* v. *Atlantic Richfield Co., ante,* at 157–158; *Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525, 540–541 (1977); *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). "We cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers and unions; obviously, much of this is left to the States." *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274, 289 (1971). The Pension Act "leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible." *Garner* v. *Teamsters,* 346 U. S. 485, 488 (1953). Here, the Court of Appeals concluded that the Minnesota statute was invalid because it trenched on what the court considered to be subjects that Congress had committed for determination to the collective-bargaining process.

There is little doubt that under the federal statutes governing labor-management relations, an employer must bargain about wages, hours, and working conditions and that pension benefits are proper subjects of compulsory bargaining. But there is nothing in the NLRA, including those sections on which appellee relies, which expressly forecloses all state regulatory power with respect to those issues, such as pension

plans, that may be the subject of collective bargaining. If the Pension Act is pre-empted here, the congressional intent to do so must be *implied* from the relevant provisions of the labor statutes. We have concluded, however, that such implication should not be made here and that a far more reliable indicium of congressional intent with respect to state authority to regulate pension plans is to be found in § 10 of the Disclosure Act. Section 10 (b) provided:

> "The provisions of this Act, except subsection (a) of this section and section 13 and any action taken thereunder, shall not be held to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of the United States or of any State affecting the operation or administration of employee welfare or pension benefit plans, or in any manner to authorize the operation or administration of any such plan contrary to any such law."

Also, § 10 (a), after shielding an employer from duplicating state and federal filing requirements, makes clear that other state laws remained unaffected:

> "Nothing contained in this subsection shall be construed to prevent any State from obtaining such additional information relating to any such plan as it may desire, or from otherwise regulating such plan."

Contrary to the Court of Appeals, we believe that the foregoing provisions, together with the legislative history of the 1958 Disclosure Act, clearly indicate that Congress at that time recognized and preserved state authority to regulate pension plans, including those plans which were the product of collective bargaining. Because the 1958 Disclosure Act was in effect at the time of the crucial events in this case, the expression of congressional intent included therein should control the decision here.[7]

---

[7] The Disclosure Act, codified at 29 U. S. C. § 301 *et seq.*, was specifi-

Congressional consideration of the problems in the pension field began in 1954, after the President sent a message to Congress recommending that

"Congress initiate a thorough study of welfare and pension funds covered by collective bargaining agreements, with a view of enacting such legislation as will protect and conserve these funds for the millions of working men and women who are the beneficiaries." [8]

In the next four years, through hearings, studies, and investigations, a Senate Subcommittee canvassed the problems of the nearly unregulated pension field and possible solutions to them. Although Congress turned up extensive evidence of kickbacks, embezzlement, and mismanagement, it concluded:

"The most serious single weakness in this private social insurance complex is not in the abuses and failings enumerated above. Overshadowing these is the too frequent practice of withholding from those most directly affected, the employee-beneficiaries, information which will permit them to determine (1) whether the program is being administered efficiently and equitably, and (2) more importantly, whether or not the assets and prospective income of the programs are sufficient to guarantee the benefits which have been promised to them." S. Rep. No. 1440, 85th Cong., 2d Sess., 12 (1958) (hereinafter S. Rep.).

As a first step toward protection of the workers' interests in their pensions, Congress enacted the 1958 Disclosure Act. The statute required plan administrators to file with the Labor

cally repealed by ERISA. 29 U. S. C. § 1031 (a) (1970 ed., Supp. V). However, ERISA was enacted on September 2, 1974—after the operative events in this case—and the repeal did not take effect until January 1, 1975. § 1031 (b) (1) (1970 ed., Supp. V). See generally n. 1, *supra*.

[8] Public Papers of The Presidents, Dwight D. Eisenhower, 1954, ¶ 5, p. 43 (1960).

Department and make available upon request both a description of the plan and an annual report containing financial information. In the case of a plan funded through a trust, the annual report was to include, *inter alia,*

> "the type and basis of funding, actuarial assumptions used, the amount of current and past service liabilities, and the number of employees both retired and nonretired covered by the plan . . . ,"

as well as a valuation of the assets of the fund.

The statute did not, however, prescribe any substantive rules to achieve either of the two purposes described above. The Senate Report explained:

> "[T]he legislation proposed is not a regulatory statute. It is a disclosure statute and by design endeavors to leave regulatory responsibility to the States." S. Rep. 18.

This objective was reflected in §§ 10 (a) and 10 (b), quoted above. As the Senate Report explained, the statute was designed "to leave to the States the detailed regulations relating to insurance, trusts and other phases of their operations." S. Rep. 19. There was "no desire to get the Federal Government involved in the regulation of these plans but a disclosure statute which is administered in close cooperation with the States could also be of great assistance to the States in carrying out their regulatory functions." *Id.,* at 18.

There is also no doubt that the Congress which adopted the Disclosure Act recognized that it was legislating with respect to pension funds many of which had been established by collective bargaining. The message from the President which had prompted the original inquiry had focused on the need to protect workers "covered by collective bargaining agreements." The problems that Congress had identified were characteristic of bargained-for plans as well as of others. The Reports of both the Senate and House Committees explained that pension funds were frequently established

through the collective-bargaining process. S. Rep. 8; H. R. Rep. No. 2283, 85th Cong., 2d Sess., 9 (1958) (hereinafter H. R. Rep.). The Senate Report emphasized the need for protection even where the plan was incorporated in a collective-bargaining agreement. S. Rep. 4, 8, 14. Congressmen explaining the bill on the floor also made clear that the bill would apply to pension plans "whether or not they have been brought into existence through collective bargaining." 104 Cong. Rec. 16420 (1958) (remarks of Cong. Lane); *id.*, at 16425 (remarks of Cong. Wolverton); see *id.*, at 7049–7052 (remarks of Sen. Kennedy). Indeed, the bill met opposition in both the Senate and the House on the ground that its approach would "require employers to surrender to labor unions economic and bargaining power which should be negotiated through the normal channels of collective bargaining." S. Rep. 34 (minority view of Sen. Allott); accord, H. R. Rep. 25 (minority views).[9] Yet neither the bill as enacted nor its

---

[9] Opponents of the bill argued that the legislation would "seriously interfere with . . . bargaining relationships" by giving labor unions access to information about the costs of certain employer-administered benefit plans. 104 Cong. Rec. 7209 (1958) (remarks of Sen. Allott). In these level-of-benefit plans, the employer guaranteed to his employees specified benefits and then undertook the full cost and management of the plan. The unions were often not told the annual cost of providing benefits under the plan. Senator Allott, the principal opponent of the bill, argued on the floor:

"Where the employer, either on his own initiative or as a result of collective bargaining, agrees to provide a level-of-benefits plan, the question of whether employees or their representatives should have further information is one to be bargained between them. How the employer intends to meet this financial obligation, or how the financial operation of the fund is set up to pay the benefits, is a matter to be settled by the parties concerned—not granted by operation of law." *Id.*, at 7208.

Congressman Bosch, the leading opponent of the bill in the House, argued bluntly:

"Those level-of-benefits plans which now operate under collective bargaining contracts were agreed to with the full knowledge by the unions

legislative history drew a distinction between collectively bargained and all other plans, either with regard to the disclosure role of the federal legislation or the regulatory functions that would remain with the States.

Appellee argues that the Disclosure Act's allocation of regulatory responsibility to the States is irrelevant here because the Disclosure Act was "enacted to deal with corruption and mismanagement of funds." Brief for Appellees 36. We think that the appellee advances an excessively narrow view of the legislative history. Congress was concerned not only with corruption, but also with the possibility that honestly managed pension plans would be terminated by the employer, leaving the employees without funded pensions at retirement age.

The Senate Report specifically stated: "Entirely aside from abuses or violations, there are compelling reasons why there should be disclosure of the financial operation of all types of plans." S. Rep. 16. The Report then reproduced a chart showing the number of pension plans registered with the Internal Revenue Service that had been terminated during a 2-month period. *Ibid.* The Senate Committee also observed: "Trusteed pension plans commonly limit benefits, even though fixed, to what can be paid out of the funds in the pension trust." *Id.,* at 15. As an illustration, the Report quoted language from a collectively bargained pension plan disclaiming any liability of the company in the event of termination.

---

involved that the cost, operation and management were the exclusive right of the persons responsible under the plans and, if the unions desired it otherwise, they could have bargained on some other basis than level-of-benefits. If the labor unions wish to change this situation, they should do it through the normal channels of collective bargaining and not by legislation." *Id.,* at 16424.

Amendments proposed by Senator Allott and Congressman Bosch seeking to exempt level-of-benefits plans from the statute were defeated. *Id.,* at 7333, 16442.

*Ibid.*[10] The Senate Report also showed an awareness of the problems posed by vesting requirements [11] and expressed concern that "employees whose rights do not mature within such contract period must rely upon the expectation that their union will be able to renew the contract or negotiate a similar one upon its termination." *Id.*, at 8. Thus, Congress was concerned with many of the same issues as are involved in this case—unexpected termination, inadequate funding, unfair vesting requirements. In preserving generally state laws "affecting the operation or administration of employee welfare or pension benefit plans," 72 Stat. 1003, Congress indicated that the States had and were to have authority to deal with these problems.

Moreover, it should be emphasized that § 10 of the Disclosure Act referred specifically to the "future," as well as

---

[10] The Report quoted "representative language" from a General Motors-UAW contract which provided:

"The pension benefits of the plan shall be only such as can be provided by the assets of the pension fund or by any insured fund, and there shall be no liability or obligation on the part of the corporation to make any further contributions to the trustee or the insurance company in event of termination of the plan. No liability for the payment of pension benefits under the plan shall be imposed upon the corporation, the officers, directors, or stockholders of the corporation." S. Rep. 15.

[11] Among the "basic facts" noted by the Committee were:

"9. The employees covered by these group plans have no specific rights until they meet the conditions of the particular plans. For example, in the case of a pension plan this might involve 30 years' service and the attainment of age 65 . . . .

"10. Although these plans envisaged a continuing operation to provide benefits for all employees covered—in plans which are not collectively bargained, which constitute the majority of all plans and which are predominantly administered by employers, there is actually no assurance that the benefits will be forthcoming in view of a universally employed clause in such plans to the effect that the employer can terminate the plan at his discretion. Even in collectively bargained plans the employer's agreement to provide for part or all the costs of the benefits is a short-term contract of 1 to 5 years," *Id.*, at 4.

"present" laws of the States. Congress was aware that the States had thus far attempted little regulation of pension plans.[12] The federal Disclosure Act was envisioned as laying a foundation for future state regulation. The Congress sought "to provide adequate information in disclosure legislation for possible later State . . . regulatory laws." H. R. Rep. 2. Senator Kennedy, a manager of the bill, explained to his colleagues:

> "The objective of the bill is to provide more adequate protection for the employee-beneficiaries of these plans through a uniform Federal disclosure act which will . . . make the facts available not only to the participants and the Federal Government but to the States, in order that any desired State regulation can be more effectively accomplished." 104 Cong. Rec. 7050 (1958).

See also S. Rep. 18. Senator Kennedy had "no doubt that this [was] an area in which the States [were] going to begin to move." 104 Cong. Rec. 7053 (1958).

The aim of the Disclosure Act was perhaps best summarized by Senator Smith, the ranking Republican on the Senate Committee and a supporter of the bill. He stated:

> "It seems to be the policy of the pending legislation to extend beyond the problem of corruption. As stated in the language of the bill, one of its aims is to make available to the employee-beneficiaries information which will permit them to determine, first, whether the program is being administered efficiently and equitably; and, second, more importantly, whether or not the assets and

---

[12] Senator Ives, who had served as chairman of the Senate Investigating Committee during the 83d Congress, explained:

"Six States already have enacted legislation on the general subject of pension and welfare plans. Other States are considering such legislation." 104 Cong. Rec. 7186–7187 (1958).

The coverage of extant state legislation was more fully discussed in S. Rep. 18.

prospective income of the programs are sufficient to guarantee the benefits which have been promised to them.

"This present bill provides for far more than anti-corruption legislation directed against the machinations of dishonest men who betray their trust. Rather, it inaugurates a new social policy of accountability. . . .

"This policy could very well lead to the establishment of mandatory standards by which these plans must be governed." *Id.*, at 7517.

It is also clear that Congress contemplated that the primary responsibility for developing such "mandatory standards" would lie with the States.

Although Congress came to a quite different conclusion in 1974 when ERISA was adopted, the 1958 Disclosure Act clearly anticipated a broad regulatory role for the States. In light of this history, we cannot hold that the Pension Act is nevertheless implicitly pre-empted by the collective-bargaining provisions of the NLRA. Congress could not have intended that bargained-for plans, which were among those that had given rise to the very problems that had so concerned Congress, were to be free from either state or federal regulation insofar as their substantive provisions were concerned. The Pension Act seeks to protect the accrued benefits of workers in the event of plan termination and to insure that the assets and prospective income of the plan are sufficient to guarantee the benefits promised—exactly the kind of problems which the 85th Congress hoped that the States would solve.

This conclusion is consistent with the Court's decision in *Teamsters* v. *Oliver*, 358 U. S. 283 (1959), which concerned a claimed conflict between a state antitrust law and the terms of a collective-bargaining agreement specially adapted to the trucking business. The agreement prescribed a wage scale for truckdrivers and, in order to prevent evasion, provided that drivers who own and drive their own vehicles should be paid, in addition to the prescribed wage, a stated minimum rental

for the use of their vehicles. An Ohio court had invalidated this portion of the collective-bargaining agreement under Ohio antitrust law. This Court reversed, noting that "[t]he application [of the Ohio law] would frustrate the parties' solution of a problem which Congress has required them to negotiate in good faith toward solving, and in the solution of which it imposed no limitations relevant here." *Id.*, at 296.

The *Oliver* opinion contains broad language affirming the independence of the collective-bargaining process from state interference:

> "Federal law here created the duty upon the parties to bargain collectively; Congress has provided for a system of federal law applicable to the agreement the parties made in response to that duty . . . and federal law sets some outside limits (not contended to be exceeded here) on what their agreement may provide . . . . We believe that there is no room in this scheme for the application here of this state policy limiting the solutions that the parties' agreement can provide to the problems of wages and working conditions." *Ibid.* (citations omitted).

The opinion nevertheless recognizes exceptions to this general rule. One of them, necessarily anticipated, was the situation where it is evident that Congress intends a different result:

> "The solution worked out by the parties was not one of a sort which Congress has indicated may be left to prohibition by the several States. Cf. *Algoma Plywood & Veneer Co.* v. *Wisconsin Employment Relations Board*, 336 U. S. 301, 307–312." *Ibid.*[13]

---

[13] The Court also pointed out:

"We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the

As we understand the 1958 Disclosure Act and its legislative history, the collective-bargaining provisions at issue here dealt with precisely the sort of subject matter "which Congress . . . indicated may be left to [regulation] by the several states." Congress clearly envisioned the exercise of state regulation power over pension funds, and we do not depart from *Oliver* in sustaining the Minnesota statute.

## III

Insofar as the Supremacy Clause issue is concerned, no different conclusion is called for because the Minnesota statute was enacted after the UAW-White Motor Corp. agreement had been in effect for several years. Appellee points out that the parties to the 1971 collective-bargaining agreement therefore had no opportunity to consider the impact of any such legislation. Although we understand the equitable considerations which underlie appellee's argument, they are not material to the resolution of the pre-emption issue since they do not render the Minnesota Pension Act any more or less consistent with congressional policy at the time it was adopted.[14]

Our decision in this case is, of course, limited to appellee's claim that the Minnesota statute is inconsistent with the federal labor statutes. Appellee's other constitutional claims are not before us. It remains for the District Court to consider on remand the contentions that the Minnesota Pension Act impairs contractual obligations and fails to provide due

federally sanctioned agreement and state policy which seeks specifically to adjust relationships in the world of commerce." 358 U. S., at 297.

The State claims that the statute is a health or safety regulation that would be valid under *Oliver,* wholly aside from the Disclosure Act. We need not pass on this contention.

[14] We note that the United States as *amicus curiae,* argues that the Minnesota statute is not pre-empted. Its view is that application of the Minnesota Pension Act to pre-1974 labor agreements is not disruptive of the federal labor scheme.

process in violation of the United States Constitution. Without intimating any views on the merits of those questions,[15] we note that appellee's claim of unfair retroactive impact can be considered in that context. All that we decide here is that the decision of the Court of Appeals finding federal pre-emption of the Minnesota Pension Act should be and hereby is

*Reversed.*

MR. JUSTICE BRENNAN and MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE joins, dissenting.

I substantially agree with the reasoning of the Court of Appeals for the Eighth Circuit in this case. 545 F. 2d 599. Accordingly, I would affirm the judgment before us.

The Court today seems to concede that Minnesota's statutory modification of the appellee's substantive obligations under its collective-bargaining agreement would be pre-empted by the federal labor laws if Congress had not somehow indicated that the State was free to impose this particular modification. *Ante,* at 513–514. The Court finds such an indication implicit in Congress' failure to undertake substantive regulation of pension plans when it enacted the so-called Disclosure Act of 1958. I do not believe, however, that inferences drawn largely from what Congress did *not* do in enacting the Disclosure Act are sufficient to override the fundamental policy of the national labor laws to leave undisturbed "the parties' solution of a problem which Congress has

---

[15] In *Fleck* v. *Spannaus,* 449 F. Supp. 644 (Minn. 1977), a three-judge District Court upheld the Minnesota Pension Act against a federal constitutional challenge based on the Contract Clause, as well as other constitutional provisions. We have noted probable jurisdiction in that case *sub nom. Allied Structural Steel Co.* v. *Spannaus,* 434 U. S. 1045, but have not yet heard oral argument.

required them to negotiate in good faith toward solving . . . ." *Teamsters* v. *Oliver*, 358 U. S. 283, 296.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, dissenting.

I join MR. JUSTICE STEWART's conclusion that the evidence as to what Congress did *not* do in the federal Welfare and Pension Plans Disclosure Act, 72 Stat. 997, 29 U. S. C. § 301 *et seq.*, is insufficient to override national labor policy barring interference by the States with privately negotiated solutions to problems[4] involving mandatory subjects of collective bargaining.

As in *Teamsters* v. *Oliver*, 358 U. S. 283, 297 (1959), "[w]e have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the federally sanctioned agreement and state policy which seeks specifically to adjust relationships in the world of commerce." The statute in this case removes from the bargaining table certain means of dealing with an inevitable trade-off between somewhat conflicting industrial relations goals—the tension between maintaining competitive standards of present compensation and, at the same time, creating a solvent fund for the security of long-term employees upon retirement. In essence, Minnesota has restricted the available options to the fully funded pension plan that vests upon 10 years of service, whenever an employer ceases to operate a place of employment or pension plan. It also imposes a principle of direct liability that well may discourage employer participation in matters of such vital importance to working men and women.

The retroactivity feature of the Minnesota measure exacerbates the degree of interference with the system of free collective bargaining. Here a statute resulting in the imposition on appellee of substantial financial liability, perhaps as large as $19 million, was enacted and took effect at a time when a

collective-bargaining agreement embodying different provisions continued in force, by virtue of an arbitration decision, even though the plant in question had closed. Essential features of the negotiated plan, including deferred funding of past-service liability, limited employer liability, and a power of termination, were negated by the legislation. The parties were given no opportunity to consider this expansion of liability in determining how the bargain should be struck. It is not unlikely that the provisions of the pension plan in issue would have been different if the parties could have predicted this statutory development. This is not, therefore, a case where state law serves as a backdrop to negotiations, while affording the parties considerable freedom to strike the best possible bargain consistent with state substantive policies. This statute became law in midterm, significantly changing the economic balance reached by the parties at the bargaining table.

In the absence of congressional indication to the contrary, or the type of local health or safety regulation adverted to in *Oliver,* the States may not alter the terms of existing collective-bargaining agreements on mandatory subjects of bargaining. Congress can be expected to take into account the impact of retroactive legislation on the bargaining process, and often provides for a delayed effective date in order to minimize any disruption.* But the States, because their

---

*Unlike the Minnesota statute, the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1001 *et seq.* (1970 ed., Supp. V), provides for a careful phasing in of the statute's requirements in the case of collectively negotiated pension plans. For such plans, ERISA funding requirements will apply only to plan years beginning after termination of the collective-bargaining agreement in effect on January 1, 1974, or plan years beginning after December 31, 1980, whichever is earlier. §§ 1061 (c) (1) and 1086 (c) (1) (1970 ed., Supp. V).

This type of considered congressional response to the special problems of arrangements flowing from collective-bargaining agreements is also found in the Equal Pay Act of 1963, § 4, 77 Stat. 57, amending the Fair Labor Standards Act of 1938, 29 U. S. C. § 206 (d). Congress provided that in

concerns are distinct from the considerations that animate a national labor policy, are unlikely to weigh—with perception and understanding—the relevant private and public interests. There is little evidence that Minnesota took more than a parochial view of these considerations when it amended retroactively the bargaining agreement of the parties.

Until Congress expresses its will in clearer fashion than the ambiguous pre-emption disclaimer of the 1958 Disclosure Act, *ante,* at 505, federal labor policy requires invalidation of the type of statute involved in this case.  I would affirm the judgment of the Court of Appeals.

---

the case of bona fide collective-bargaining agreements in effect at least 30 days prior to the date of enactment of the 1963 measure, the amendments would take effect upon the termination of such collective-bargaining agreement or upon the expiration of two years from the enactment date, whichever occurred first.