**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), et al., Plaintiffs-Appellees,**

v.

**WHITE MOTOR CORPORATION et al., Defendants-Appellants.**

**No. 74–1379.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 11, 1974.

Decided Nov. 11, 1974.

Rehearing Denied Nov. 27, 1974.

**1194**

Frank C. Heath, Cleveland, Ohio, for defendant-appellant.

John A. Fillion, International Union, UAW, Detroit, Mich., for plaintiff-appellee.

Before GIBSON, Chief Judge; BRIGHT and STEPHENSON, Circuit Judges.

BRIGHT, Circuit Judge.

White Motor Corporation (Company) appeals from the judgment of the district court enforcing an arbitration award in favor of appellee-United Auto Workers Union (Union). We affirm.

In January 1972, the Company notified the Union that it planned to close two factories manufacturing farm machinery located at Hopkins and Minneapolis, Minnesota. The Company also informed the Union that the Pension Plan for the employees at these two plants would be terminated as of June 30, 1972. The Union, claiming that the Pension Plan could not be terminated until May 1, 1974, the expiration date of the Collective Bargaining Agreement, sought arbitration of the dispute. The Company refused, and on motion of the Union, the federal district court issued an order compelling arbitration. The arbitrator sustained the Union's position and his award prohibited the Company from terminating the Pension Plan for Union-represented employees before the expiration date of the Collective Bargaining Agreement. White Motor Corp. & UAW, 61 Lab.Arb. 320 (1973) (Seitz, Arbitrator). After the Company announced that it would not comply with the arbitration award, the Union sought enforcement of the award in a suit filed in federal district court pursuant to Section 301 of the Labor-Management Relations Act, as amended, 29 U.S.C. § 185. On cross motions for summary judgment, the district court (Judge Larson) ruled in favor of the Union and ordered enforcement of the award. The Company appeals from that decision.

The Company contends that specific and unequivocal language in an agreement between the parties authorized it to terminate the then existing Pension Plan at any time. The phrase relied on by the Company, as found in the Pension Plan, reads: "The Company shall have the sole right at any time to terminate the entire Plan." The Company maintains that since the foregoing provision is "clear and unambiguous," the arbitrator exceeded his authority in ex-

tending the Pension Plan beyond June 30, 1972, the termination date selected by the Company.

In ruling for the Union, the arbitrator did not limit his analysis to the explicit terms of the Collective Bargaining Agreement and the Pension Plan but also examined the history of the pension arrangements commencing with the agreements executed in 1950 between the Company and the Union [1] consisting of three separate documents—a Collective Bargaining Agreement, a Pension Agreement, and a Pension Plan. The Pension Agreement recited that the Company would adopt and establish a Pension Plan in the form attached for the benefit of all employees, including both union and nonunion workers. Section 10.02 of that attached Pension Plan recited the crucial language, to which we have referred, ostensibly granting the Company the right to terminate the Pension Plan at will. This right of termination, however, did not become binding on Union employees since the Pension Agreement embodied this stipulation:

> The Company waives its right to amend the [Pension] Plan or terminate it as to employees represented by the Union while this [Pension] Agreement is in full force and effect.

The 1950 Collective Bargaining Agreement listed a termination date of September 1, 1952,[2] while the Pension Agreement recited a later expiration date of January 1, 1956.[3] Prior to 1968, the Union and the Company made periodic changes in the pension arrangements by formally amending the Pension Agreement through written documents, each entitled "Amendment of Pension Agreement." These amendments were dated respectively November 16, 1954, February 8, 1957, October 22, 1959, October 1, 1962, and May 10, 1965. Except for the May 10, 1965, amendment, each amendment provided a termination date for the Pension Agreement extending beyond the expiration date of the then existing Collective Bargaining Agreement. For example, the Amendment of Pension Agreement dated October 1, 1962, extended the 1950 Pension Agreement to January 1, 1966, although the terms of the then existing Collective Bargaining Agreement contained a termination date of May 1, 1965. In 1965, however, the Amendment of Pension Agreement and the Collective Bargaining Agreement provided for essentially the same termination date.[4] Each Amendment of the Pension Agreement included a separate paragraph with essentially the following language:[5]

> In all other respects [except as amended] the Pension Agreement entered into between the parties hereto under date of September 7, 1950, and the Pension Plan therein referred to are hereby ratified and confirmed. [Amendment of Pension Agreement dated November 16, 1954.]

Thus, until 1968, the respective rights of the parties regarding termination of the Pension Plan were clear. The Company reserved the right to unilaterally

1. The United Auto Workers became the bargaining representative for the employees on July 6, 1955. Prior to that date, the employees were represented by Local 1146 of the United Electrical, Radio and Machine Workers of America.

2. The Collective Bargaining Agreement was to continue thereafter for yearly periods unless the parties gave a notice of termination at least 60 days prior to the end of the contract period.

3. The Pension Agreement was to continue on a yearly basis thereafter unless terminated by one of the parties on six months notice.

4. The Collective Bargaining Agreement terminated at 12:01 A.M. May 1, 1968, while the Amendment of Pension Agreement terminated April 30, 1968.

5. This paragraph was slightly altered in the 1965 Amendment of Pension Agreement:
   > In all other respects said Pension Agreement, as amended, and the Pension Plan referred to therein, as amended, are hereby ratified and confirmed.

   Additionally, the 1962–1965 and the 1965–1968 Collective Bargaining Agreements contained general information concerning benefits available under the Pension Plan.

terminate the Pension Plan for nonunion employees at any time. As to Union employees, however, the Company's right to terminate the Pension Plan was limited to the expiration date specified in the Pension Agreements and its subsequent amendments.

In the Collective Bargaining Agreements for 1968–1971 and 1971–1974, the format for the pension arrangements was altered. These bargaining agreements each contained this paragraph:

> The parties hereto have agreed to a *Pension Agreement and Plan,* printed under separate cover, which is made a part of this Agreement the same as if set forth at length herein. (Emphasis added).

A signed document entitled "Minneapolis-Moline Pension Plan" was attached to these Bargaining Agreements. This attachment included similar terms and was essentially the same in format as the original 1950 Pension Plan, with, of course, changes in benefits derived from the various amendments made over the intervening years.

The parties in 1968 and 1971, however, did not execute any document similar to the Pension Agreement of 1950, nor any agreement similar to the later documents entitled Amendment to Pension Agreement, in which the Company had expressly agreed to waive its right to unilaterally terminate the Pension Plan at any time as to Union employees. Because of the absence of a waiver provision in the 1968 and 1971 documents, the Company argues that the clause in the Pension Plan providing for termination "at any time" becomes the controlling provision of the agreement regulating termination of the Pension Plan as to all employees. In rejecting this argument, the arbitrator stated:

> The record made satisfies me that in the negotiations leading to the 1968 collective agreement and the 1968 Pension Agreement and Plan, neither side made a demand or proposal related to the abandonment of the waiver provisions; and, apparently, it had

not been the subject of bargaining or even discussion. The Union brief argues that the absence of the waiver provision was not even noticed.
> \* \* \*
> A long-standing and repeatedly expressed waiver of a right to terminate a Pension Plan as to union-represented employees disappeared from the 1968 and 1971 Pension Agreements under circumstances that nobody can account for or explain. The absence of the provision affects very substantial rights under the Plan.

The arbitrator concluded:

> Thus, the 1971 Pension Agreement and Plan which was merged into and absorbed by and is a component of the collective bargaining agreement lives to the end of the term of the collective bargaining agreement. The Plan has no independent termination date nor is there a Pension Agreement with a different termination date. The Pension Agreement and Plan of 1971 draw their termination date from the collective bargaining agreement of which they are parts.
>
> These circumstances leave the Company free to invoke Section 10.02 of the Plan to terminate the Plan at will insofar as members of non-bargaining unions are concerned. The fact that the Plan has been absorbed into the collective bargaining agreement, however, reinforces the point that, insofar as union-represented employees are concerned, the Company's right to terminate, expressed in Section 10.02 of the Plan, is affected by and is subordinated to the provisions of the collective agreement.
>
> Accordingly, on this question, I conclude that the Company had no power or right unilaterally to terminate the Plan as to union-represented employees on June 30, 1972. (Footnote omitted).

The district court ruled that the arbitrator had not exceeded his authority and ordered the arbitrator's award enforced. The Company asserts that the arbitrator

exceeded his authority in not enforcing the clear terms of a written agreement binding the parties on the issue presented to the arbitrator and that, therefore, the district court committed error in not setting the arbitrator's award aside.

■■ In resolving this case, we note initially that judicial review of an arbitrator's decision is limited. The scope of that review is discussed by the Supreme Court in United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L. Ed.2d 1424 (1960):

> The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. * * * [T]he arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process. They sit to settle disputes at the plant level—disputes that require for their solution knowledge of the custom and practices of a particular factory or of a particular industry as reflected in particular agreements.
>
> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. * * * He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity

to this obligation, courts have no choice but to refuse enforcement of the award. [*Id.* at 596–597, 80 S.Ct. at 1360–1361 (footnote omitted).] [6]

Thus, our function is limited solely to determining whether the arbitration decision, in the language of the Supreme Court, "draws its essence from the collective bargaining agreement." 363 U.S. at 597, 80 S.Ct. at 1361.

■ In interpreting a collective bargaining agreement it is often necessary to go outside the four corners of the contract itself and examine the agreement history to ascertain the intent of the agreement and determine the rights and duties of the parties. The touchstone for the construction and interpretation of labor agreements subject to arbitration is found in the *Steelworkers Trilogy, supra.* In the second case of the *Trilogy,* United Steelworkers of America v. Warrior & Gulf Nav. Co., *supra,* the Supreme Court specifically examined the unique characteristics of the labor contract with which the arbitrator deals:

> The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. * * * The collective agreement covers the whole employment relationship. It calls into being a new common law— the common law of a particular industry or of a particular plant.
>
> " * * * There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties.

6. *See* United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 567–569, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582–583, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960) (these two cases and United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 563, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) comprise the *Steelworkers Trilogy*); West-

ern Iowa Pork Co. v. National Bro. Pack & Dairy Wkrs, 366 F.2d 275 (8th Cir. 1966). In *Western Iowa Pork*, this court stated that " * * * in making the determination of whether an arbitrator has exceeded his authority the agreement must be broadly construed with all doubts being resolved in favor of his authority." 366 F.2d at 277.

One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages * * *."

Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement. [363 U.S. at 578–580, 80 S.Ct. at 1351–1352.]

In discussing the labor arbitrator's source of law, the Court added that he is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. [363 U. S. at 581–582, 80 S.Ct. at 1352.]

In Humble Oil & Refining Co. v. Teamsters Local 866, 447 F.2d 229 (2d Cir. 1971), the Second Circuit, in discussing the authority of the arbitrator to resolve a labor-management issue by relying on agreement history, stated:

To determine whether the Company had violated rights intended by the parties to be preserved by the language of that provision, the [arbitration] Board was required to discover the intent of the parties, and to do this it looked to evidence and not merely the cold and cryptic words on the face of the agreement which shed little light on the issue. We see nothing in the arbitration clause which forbids resort to such rudimentary tools of construction. If the Board were barred from resorting to bargaining history and rights established under similar language in past contracts, the parties to the contract would be remitted to securing arbitration only when there was a violation of a provision so plain and unambiguous as to require no collateral evidence of intent—and we might add hardly requiring arbitration itself. * * * The arbitrators here, * * * confronted with an opaque but "express provision" of the contract governing the rights at issue, sensibly sought clarification in totally relevant evidence beyond the language of the contract. [Id. at 232–233.]

Other cases support the view that an arbitrator may examine agreement history in order to resolve a question not expressly covered by a collective bargaining agreement. See Baldwin-Montrose Chem. Co. v. International Rubber & Plastic Wkrs, 383 F.2d 796 (6th Cir. 1967); H. K. Porter v. United Saw, File & Steel Products Wkrs, 333 F.2d 596 (3d Cir. 1964); Independent Petroleum Wkrs v. American Oil Co., 324 F.2d 903 (7th Cir. 1963), aff'd by an equally divided court, 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964); cf. Teamsters Local 688 v. Crown Cork & Seal Co., 488 F.2d 738 (8th Cir. 1973).

■■ We believe the record demonstrates that the Collective Bargaining Agreement executed in 1971 (as well as 1968), discloses an ambiguity in two respects relating to the Company's right of termination. First, the Bargaining Agreement specifically refers to an attached "Pension Agreement and Plan." This phrase could refer to a single document consisting of both a Pension Agreement and a Pension Plan or, as had been the case in prior years, to two documents, a separate Pension Plan and a separate Pension Agreement. As we have already noted, the attached Pension Agreement and Plan was entitled "Minneapolis-Moline Pension Plan" and referred to a document essentially the same in form as the 1950 Pension Plan but with modifications wrought by amendments made over the past two decades. The phrase "Pension Agreement," as previously used by the parties, designated a document separate from the Pension Plan and contained a termination date and a specific waiver of the Company's right to terminate the Pension Plan at will as to Union employees. Since neither the contract documents nor contemporaneous history of the 1968 and 1971 Bargaining Agreements offers any explanation for the absence of an attachment to the Bargaining Agreement entitled "Pension Agreement," an arbitrator could conclude that this omis-

sion was inadvertent, permitting him to resort to evidence extrinsic to the written contract documents to determine the full agreement intended by the parties. When an agreement may be expected to speak on a subject but does not, its silence imports ambiguity on that subject. *See* Humble Oil & Refining Co. v. Teamsters Local 866, 447 F.2d 229 (2d Cir. 1971); Baldwin-Montrose Chem. Co. v. International Rubber & Plastic Wkrs, 383 F.2d 796 (6th Cir. 1967); H. K. Porter v. United Saw, File & Steel Products Wkrs, 333 F.2d 596 (3d Cir. 1964).

In commenting on this omission, the arbitrator observed:

[T]he writer's experience informs him that it is most difficult to conceive that a Union would knowingly, lightly, or casually acquiesce in the elimination of a Company waiver of a right to terminate a pension plan in which the employees it represents participate without a vigorous struggle or, at least, the attempt to obtain some satisfactory quid pro quo. To accept the Company's thesis would mean that one week after the signing of the 1971 (or 1968) pension agreement and plan, the Company, at will, could have terminated the Plan, despite the fact that it had agreed in writing to waive the exercise of that right for eighteen years in a series of five documents. The Company's thesis is incompatible with the institutional behavior of labor organizations in our society and does not take account of the reasonable expectations that the usages of the past have engendered.

■ The arbitrator properly noted a second aspect of the ambiguity relating to the termination date for the Pension Plan. The bargaining history disclosed that prior to 1968 the parties had always specified a definite termination date of the Pension Plan extending to or beyond the date established for the expiration of the Collective Bargaining Agreement. But in 1968 and 1971, the "Minneapolis-Moline Pension Plan" did not contain any specific termination date. Given this omission, the arbitrator did not exceed his authority in concluding that the May 1, 1974, date for termination of the Collective Bargaining Agreement as the only relevant date specified in the documents executed by the parties served also as the termination date of the Pension Plan as to Union members.

Our review of the record satisfies us that the arbitrator arrived at a decision drawn from the contract documents and from the history of the agreements leading up to the 1971 Collective Bargaining Agreement. We conclude, contrary to the Company's contentions, that the arbitrator did not exceed his arbitral authority and that his award is valid since it "draws its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel & Car Corp., *supra,* 363 U.S. at 597, 80 S.Ct. at 1361.

Accordingly, the district court properly enforced the arbitrator's award.

Affirmed.