**OZARK AIR LINES, INC., Appellant,**

**v.**

**The AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Appellee.**

**No. 84–1055.**

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1984.

Decided Oct. 1, 1984.

Rehearing En Banc Granted Dec. 6, 1984.

---

Donald J. Meyer, Clayton, Mo., for appellant Ozark Air Lines, Inc.

Gary Green, R. Russell Bailey, Daniel S. Kozma, Washington, D.C., for appellee Air Line Pilots Ass'n Int'l.

Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

BRIGHT, Circuit Judge.

This case arises from a dispute between the parties as to whether the absence from work of two injured pilots should be characterized as "occupational sick leave" or as "regular sick leave" under the governing labor agreement. The system board of adjustment, to which the dispute was referred, agreed with the Pilots Association that the absences qualified as occupational sick leave. The district court, 577 F.Supp. 487,[1] on the parties' cross-motions for summary judgment, upheld the board's decision. Ozark appeals. We affirm.

I. BACKGROUND.

Under the labor agreement between Ozark and the Pilots Association, each pilot accrued both occupational sick leave credit and regular sick leave credit. When a pilot missed work because of injury or illness, he was entitled to collect pay for the time missed, deductible against one or both of his accrued sick leave credit accounts. Absences attributable to "occupational injury"

---

**1.** The Honorable Roy W. Harper, United States Senior District Judge for the Eastern District of Missouri.

were deductible against accrued occupational sick leave time, until the account was exhausted, and then against accrued regular sick leave time. Absences other than those attributable to "occupational injury," however, were deductible only against accrued regular sick leave time.[2] The labor agreement did not define "occupational injury." It provided only that, "[w]hen the Company [*i.e.*, Ozark] determines that an employee has an occupational injury, such employee shall be eligible for occupational injury pay."

This case arose after two pilots filed for occupational sick leave pay, claiming to have suffered back injuries while on the job. Ozark paid them sick leave, but charged their absences against their accrued regular sick leave time rather than against their accrued occupational sick leave time, on the ground that, though the injuries had occurred on the job, they were not "accidental" and thus would not be compensable under the workers' compensation law of the pilots' home state, Missouri. In response to Ozark's action, the Pilots Association initiated grievance proceedings. The dispute was eventually referred for arbitration to the system board of adjustment, pursuant to the terms of the labor agreement.

The agreement provided for a four-member board, consisting of two representatives of Ozark and two representatives of the Pilots Association. The board's decisions were to be final and binding on all parties. The agreement provided that, in case of a deadlock among the four-member board, either Ozark or the Pilots Association could petition the National Mediation Board to appoint a neutral referee to serve as the fifth member of the board to resolve the deadlock.

When the grievances in this case were initially submitted to the four-member board, Ozark argued that the board lacked jurisdiction to decide the controversy.

Ozark contended that the labor agreement gave Ozark unreviewable discretion to determine whether a pilot's absence was attributable to "occupational injury." Ozark rested this claim on the single sentence in the agreement which provided that occupational leave pay was available "[w]hen the Company determines that an employee has an occupational injury." The Pilots Association argued that the board of adjustment did have jurisdiction over the grievances. It pointed to language in the labor agreement which gave the board power to decide all disputes "growing out of grievances or out of interpretation or application of any of the terms of the * * * Agreement." The Pilots Association contended that the meaning of "occupational injury" and the extent of Ozark's discretion under the agreement were questions of interpretation of the terms of the agreement, and were therefore subject to arbitration by the board.

The four-member board deadlocked on the arbitrability issue. The Pilots Association then petitioned for appointment of a neutral referee to serve as the tiebreaking fifth member. The referee sided with the Pilots Association's representatives, holding that the grievances were arbitrable. Ozark does not contest this decision.

Ozark then moved that the five-member board, having resolved the threshold arbitrability issue, remand the merits of the grievances to the four-member board for resolution. The five-member board held, however, on a 3 to 2 vote, that it had jurisdiction over the merits and need not remand the grievances to the four-member board. It then decided the merits of both grievances in favor of the pilots, again by a vote of 3 to 2.

On appeal, Ozark raises two issues. First, it contends that the five-member board had jurisdiction only over the arbitrability issue, not over the merits of the grievances, and should therefore have re-

---

**2.** Though the rate of sick leave pay is the same whether the absence is characterized as regular or as occupational, the pilots would apparently prefer to have the absences charged against oc-
cupational leave, in order to conserve their regular leave time to apply against future nonoccupational absences.

manded the merits to the four-member board for decision. Second, Ozark argues that even if the five-member board had jurisdiction over the merits, its decision on the merits does not draw its essence from the labor agreement and therefore should not be enforced.

## II. DISCUSSION.

### A. Scope of Judicial Review.

■ A court reviewing the decision of an airline system board of adjustment may set the decision aside on any of three grounds: (1) failure of the board to comply with the provisions of the Railway Labor Act, 45 U.S.C. §§ 151–188, (2) failure of the board to confine itself to matters within its jurisdiction, and (3) fraud or corruption of a member of the board. 45 U.S.C. §§ 184, 153 First (q). *See Loveless v. Eastern Air Lines,* 681 F.2d 1272, 1275–78 (11th Cir. 1982); *Hunt v. Northwest Airlines,* 600 F.2d 176, 177–79 (8th Cir.), *cert. denied,* 444 U.S. 946, 100 S.Ct. 308, 62 L.Ed.2d 315 (1979).

■ Where, as here, the party seeking to have the board's order set aside contends that the board acted beyond its jurisdiction, the reviewing court's role is limited solely to determining whether the board exceeded its jurisdiction. Once the court determines that the board acted within the scope of its authority—that is, that the board conformed to the limits on its authority set forth in the labor agreement, and that the award draws its essence from the agreement—the court's task is finished. A court will not set aside an award rendered within the scope of the board's jurisdiction, either for ordinary error or because the court would itself have reached a different resolution of the merits had the parties submitted the merits for judicial determination in the first instance. *Zeviar v. Local 2747, Airline, Aerospace and Allied Employees,* 733 F.2d 556, 559 (8th Cir.1984); *Loveless v. Eastern Air Lines, supra,* 681 F.2d at 1275–76. *Cf. Daniel Construction Co. v. Int'l Union of Operating Engineers,* 738 F.2d 296, at 299–300 (8th Cir. 1984) (applying same standard to review of an arbitrator's decision under section 301

of the Labor Management Relations Act). Moreover, when disagreement arises between the parties whether a particular dispute is arbitrable under the terms of the governing labor agreement, courts will broadly construe the agreement in favor of arbitrability, resolving doubts on the side of the board's authority. *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960); *Zeviar v. Local 2747, supra,* 733 F.2d at 559; *Lackawanna Leather v. United Food & Commercial Workers,* 706 F.2d 228, 230–31 (8th Cir.1983) (en banc).

### B. Jurisdiction of the Five-Member Board to Decide the Grievances on Their Merits.

■ Both of the board rulings that Ozark challenges are matters of interpretation of terms of the labor agreement. The first issue—whether the five-member board had jurisdiction over the merits of the grievances, or only over the threshold question of arbitrability—turns on the interpretation of the following language in the agreement:

When a deadlock occurs in a case referred to the Board, it shall be the duty of the Board to endeavor to reach a decision, and failing in this, to agree, within thirty (30) days of the date of such deadlock, upon a procedure for breaking the deadlock. The said procedure for breaking the deadlock shall, when found necessary as a final step to settle a deadlocked case, include the appointment of a neutral person to be known as a referee to sit with the Board as a member thereof and make the award. In any case where the said System Board of Adjustment becomes deadlocked and unable to reach a decision upon a method for breaking the deadlock or unable to mutually agree upon the appointment of a referee within the above prescribed thirty (30) days, either the Company or the Association may within thirty (30) days thereafter petition the National Mediation Board for the appointment of a neu-

tral referee to sit with the System Board of Adjustment as a member thereof. In case neither party shall so petition the National Mediation Board within the above prescribed thirty (30) day period, the matter in question shall be deemed by all parties concerned to be ended and no action thereon shall be taken thereafter by either party. Such Board of Adjustment, as then constituted, shall hear the parties with reference to the dispute pending before it, and a majority vote of the Board shall be final, binding and conclusive between the Company and the Association and anyone they may represent having an interest in the dispute.

The Pilots Association argued before the five-member board that this language meant that, once the four-member board had deadlocked on any aspect of a pending case, a fifth member was to be appointed to sit with the board to resolve the whole dispute, not merely the narrow question on which the four members initially deadlocked. Ozark, however, argued that, where the four members deadlocked on a single issue within a case, the fifth member sat only to resolve that single issue, and not to participate in the board's deliberations on any other aspect of the case.

The five-member board acknowledged the plausibility of Ozark's interpretation of the provision in question. Nevertheless, the board concluded that it had jurisdiction over the whole pending grievance. Ozark now asks this court to set the board's ruling aside on the ground that it does not draw its essence from the contract.

We agree with the board that the disputed provision is fairly susceptible of either of the two conflicting interpretations offered by the parties. The interpretation adopted by the board is, however, at least as well grounded in the language of the agreement as is the interpretation Ozark urges.

In particular, the agreement provides that, "[w]hen a deadlock occurs *in a case,*" a neutral referee may be appointed "to sit with the Board as a member thereof *and make the award*" (emphasis added). "Making the award" in a "case" in which a deadlock has occurred seems naturally to refer to rendering the final dispositive judgment between the parties in the proceeding, rather than merely to deciding some issue or question preliminary to a consideration of the merits. The agreement further provides that, upon the appointment of the neutral fifth member, the board of adjustment, "as then constituted, shall hear the parties with reference to *the dispute pending before it* " (emphasis added). The meaning of "the dispute pending before it" is unclear; the phrase could refer either to the whole controversy before the board, or to that narrower part of the controversy which gave rise to the specific deadlock that the referee was initially summoned to resolve. In any event, the interpretation on which the board settled is at least fully consistent with the language in question. The language of the agreement certainly lends no stronger support to Ozark's interpretation than to that adopted by the board.

The board, then, did nothing more than give admittedly ambiguous language a construction at least as plausible as any other suggested. We have no basis for saying that the board ruling fails to draw its essence from the contract. Therefore we cannot set the board's ruling aside.[3]

### C. The Meaning of "Occupational Injury."

After the board of adjustment determined that the grievances were arbitrable and that the neutral referee could participate in the proceedings on the merits, it undertook to decide whether Ozark had properly denied the two injured pilots occupational sick leave pay.

**3.** Ozark does not contend that the five-member board had no authority to resolve the dispute over whether the merits should be heard by the five-member or the four-member board. Both parties argued their positions on the construc- tion of the disputed language to the five-member board, an implicit concession that they believed the board as so constituted to be the proper body to decide the question.

Ozark argued that, given the lack of any definition of "occupational injury" in the labor agreement, it was free to follow its longstanding practice of paying occupational sick leave pay only to pilots whose injuries were compensable under the workers' compensation laws of the state of their domicile. For the pending grievances, Ozark contended, the appropriate standard was Missouri workers' compensation law, under which benefits were available only for "accidental" injuries sustained on the job.[4] In any event, Ozark argued, the labor agreement clearly left it up to Ozark to determine whether an occupational injury had occurred; the board of adjustment was bound to give the words, "[w]hen the Company determines that an employee has an occupational injury" their plain meaning and to defer to Ozark's characterization of the injuries as nonoccupational.

The Pilots Association argued, however, that the bargaining history behind the labor agreement showed the contested language to have a different meaning. According to the Association, "occupational injury" meant any injury sustained on the job, whether or not compensable under state workers' compensation laws. In the Association's view, the airline's role was limited to determining whether an injury had occurred on the job. If the airline so found, the pilot was entitled to occupational sick leave pay.

The board of adjustment reviewed the bargaining history and previous labor agreements between the parties. It found that, prior to 1975, Ozark paid occupational sick leave pay to an injured pilot only after a state workers' compensation board had determined that the pilot had suffered a compensable injury. In contract negotiations in 1975, however, the Pilots Association sought to have eligibility for occupational leave determined on a basis other than compensability under state workers' compensation law.

The language at issue in this case ("[w]hen the Company determines that an employee has an occupational injury," etc.)

was adopted during the 1975 negotiations. With the adoption of the new language, Ozark no longer waited until a state workers' compensation board had determined an employee to have suffered a compensable injury before paying occupational leave pay. Instead, Ozark made the "occupational injury" determination itself, still, apparently, using state law compensability as the standard, though nowhere in the contract is "occupational injury" defined in terms of state law compensability.

The board of adjustment concluded that the Pilots Association, at the close of the 1975 negotiations, believed that the new language completely divorced "occupational injury" from compensability under state workers' compensation law. Because Ozark drafted the language in question, the board held that any ambiguities in the language which had given rise to misunderstanding on the Pilots Association's part should be construed against Ozark. Accordingly, the board adopted the Pilots Association's interpretation of the disputed language. Under that interpretation, the injured pilots were entitled to occupational sick leave pay.

Ozark's principal contention on appeal is that the board's ruling fails to draw its essence from the contract, to the extent that it rests not on the language of the contract but on the bargaining history and on the rule of interpretation that ambiguous language is to be construed against its drafter. According to Ozark, there is nothing ambiguous about the language, "[w]hen the Company determines that an employee has an occupational injury, such employee shall be eligible for occupational injury pay." Therefore, Ozark contends, the board had no authority to look beyond the language of the agreement to the bargaining history underlying it.

■ We reject Ozark's position. It is settled that, in construing the terms of a labor agreement, the arbitrator "may * * * look for guidance from many sources." *United Steelworkers of America v. Enter-*

4. The parties do not dispute that the grievant

pilots did not suffer such "accidental" injuries.

*prise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). This court has upheld other arbitral decisions that look beyond the terms of the labor agreement to past agreements between the parties and to various collateral instruments. *See Rainbow Glass Co. v. Local Union No. 610*, 663 F.2d 814 (8th Cir.1981); *UAW v. White Motor Corp.*, 505 F.2d 1193 (8th Cir.1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975). Resort to such extrinsic sources as bargaining history and past and collateral agreements is permissible even where the terms of the agreement are superficially clear, if the arbitrator discerns a latent ambiguity in any of the terms or if the language of the agreement does not appear fully to express the intent of the parties. *Loveless v. Eastern Air Lines, supra*, 681 F.2d at 1278–80; *Humble Oil & Refining Co. v. Local 866, Int'l Brotherhood of Teamsters*, 447 F.2d 229, 232–33 (2d Cir. 1971). In such circumstances, an arbitral award does not fail to draw its essence from the contract merely because it is based in part on sources other than the contractual language itself.

■ In this case, we cannot say that the board's award fails to draw its essence from the labor agreement. The agreement nowhere defines "occupational injury." Neither is the language, "[w]hen the Company determines that an employee has an occupational injury," so clear and explicit a reservation of exclusive authority to Ozark as to preclude the board from looking to plainly relevant extrinsic sources to discern

what the parties meant by the language.[5] Confronted by a dispute between the parties over the meaning of the provision, the board had the authority to look beyond the language of the agreement to determine the meaning of the terms in question.

■ The board adopted the Pilots Association's view that the labor agreement limited Ozark to making the factual determination whether a pilot's injury had occurred on the job. This interpretation is not inconsistent with the agreement language, which taken alone gives no indication as to what the parties meant by "occupational injury." Ozark's argument that the agreement gave it complete freedom to define "occupational injury" as it chooses, would, if carried to its logical end, entitle the airline to deny occupational sick leave pay to every claimant, no matter how meritorious his claim, on any ground whatsoever. Though Ozark has never administered the sick leave program in such an arbitrary or restrictive manner, the board was plainly entitled to reject, as likely not reflecting the intent of the parties, an interpretation of the contract language which would empower Ozark to act so arbitrarily as to render the whole occupational sick leave program ineffective. Having concluded that the agreement did not give the airline unfettered discretion to define "occupational injury" as it pleased, the board merely settled on one reasonable definition of the term rather than another. In determining that the agreement entitled pilots to occupational sick leave pay for any injury sustained on the job, rather than only for

5. This case thus stands in sharp distinction from *St. Louis Theatrical Co. v. St. Louis Theatrical Brotherhood*, 715 F.2d 405 (8th Cir.1983). There, the contract absolutely prohibited work stoppages, and expressly provided that, except as to the fact of an employee's participation in such stoppages, there was to be no arbitration of alleged violations of the no-work-stoppage clause. We set aside the arbitrator's award reducing the discipline imposed against an employee whom the arbitrator found to have engaged in a work stoppage, on the ground that the award violated the express limitation on the scope of arbitration.

In the case now before us, the disputed language ("[w]hen the Company determines that an

employee has an occupational injury," *etc.*) does not constitute a clear, express limitation on the board's arbitral authority. Rather, the extent to which it limits the board is itself a matter of interpretation, respecting which we defer to the board, resolving doubts in favor of board authority. *See United Steelworkers v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53; *Zeviar v. Local 2747, supra*, 733 F.2d at 559. To fail to give full play to the arbitration clause of the agreement, absent a clear and definite indication that the parties intended to limit the scope of arbitration on this issue, would do violence both to the labor agreement and to the Railway Labor Act's policy favoring the arbitration of contract disputes.

injuries compensable under state workers' compensation law, the board simply inferred from the bargaining history, with the help of a familiar rule of construction, a definitional standard for "occupational injury," a term not defined in the agreement itself. We cannot characterize such an inference as improper or as beyond the authority of the board to make.

This court's role extends no further than ascertaining, as we have, that the board rationally resorted to relevant extrinsic evidence and to settled rules of interpretation in construing the labor agreement, and that nothing in the agreement prohibited it from doing so. As long as the board stayed within the scope of its authority, we do not sit to review the substance of its decision. Accordingly, we decline to set the board's award aside.

### III. CONCLUSION.

The decision of the district court is affirmed. The Pilots Association's motion for fees and double costs on grounds of frivolousness is denied.

McMILLIAN, Circuit Judge, dissenting.

I agree that where the terms of the collective bargaining agreement are superficially clear and facially unambiguous, the arbitrator may look for guidance outside the terms of the agreement to extrinsic or collateral sources, if there is a latent ambiguity. *See Rainbow Glass Co. v. Local Union No. 610, International Brotherhood of Teamsters*, 663 F.2d 814, 817 (8th Cir.1981); *accord Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272, 1280 (11th Cir. 1982) (excellent discussion).

My disagreement with the majority lies in the application of this rule to the language at issue in this case. I do not agree that the language at issue is only superficially clear and facially unambiguous or contains any latent ambiguity. The language at issue expressly states that whether an employee has an occupational injury will be determined by the company, thus clearly reserving to the company the tasks of determining what constitutes an occupational injury and whether a particular employee has an occupational injury. Because the language at issue is plain and unambiguous, the board should not have considered extrinsic or collateral materials. The board's award is inconsistent with the language at issue and therefore cannot be said to draw its essence from the collective bargaining agreement. I would reverse the judgment of the district court.