**TEXTILE PROCESSORS, SERVICE TRADES, HEALTH CARE, PROFESSIONAL AND TECHNICAL EMPLOYEES INTERNATIONAL UNION LOCAL 108 and Roy Suarez, Plaintiffs and Counter-Defendants,**

v.

**MORGAN SYSTEMS, INC., Defendant and Counter-Plaintiff.**

No. 83–2508C(3).

United States District Court, E.D. Missouri, E.D.

March 21, 1985.

Robert E. Ahrens, St. Louis, Mo., for plaintiffs and counter-defendants.

Sarah J. Herrin & Gerald Tockman, St. Louis, Mo., for defendant and counter-plaintiff.

## MEMORANDUM

HUNGATE, District Judge.

This matter is before the Court for a decision on the merits of the counterclaim of defendant/counter-plaintiff, Morgan Systems, Inc. (hereinafter Company) against plaintiffs/counter-defendants Textile Processors, Service Trades, Health Care, Professional and Technical Employees International Union Local 108 (hereinafter Union) and Roy Suarez.

This action was originally brought by the Union to enforce an arbitrator's award and the Company counterclaimed for an order vacating the arbitrator's award and seeking damages for breach of the union contract.

The Court granted summary judgment for the Union as to the enforceability of the arbitrator's award, 583 F.Supp. 403, and held a nonjury trial on the Company's counterclaim on November 19, 1984, allowing the parties a full opportunity to present evidence.

Having considered the pleadings, trial testimony, exhibits, stipulations, and memoranda of the parties, and being fully advised in the premises, the Court hereby makes and enters the following findings of fact and conclusions of law.

### Findings of Fact

1. The Company's principal place of business is located at 3124 Olive Street in the City of St. Louis, Missouri. The Company supplies linens, industrial garments, and dust control items to commercial, industrial, and institutional customers.

2. The Union is a labor organization with its office and principal place of business in the City of St. Louis, Missouri, and represents employee-members in this judicial district.

3. Roy Suarez, Thomas W. Smith, and Josephine Odom were officers and agents of the Union at all times material herein.

4. At all times material, the Union has been recognized as the sole and exclusive collective bargaining representative for all inside laundry production employees. At all times material hereto, the route servicemen at the St. Louis facility have been represented by Teamsters Local 682 (hereinafter Teamsters).

5. At all times material, the Company and the Union have been parties to a collective bargaining agreement. This agreement provides, in pertinent part:

### ARTICLE X
### MANAGEMENT RIGHTS

Except as specifically limited by the express provisions of this Agreement, the Company has and maintains the sole and exclusive right to control its properties, manage its business and direct the working force including by way of example but not in any way limited to, the right to hire, promote, demote, transfer or assign and direct employees; to make, change, amend and enforce posted plant rules and regulations; to increase or decrease the working force, determine the number of job operations, the work to be performed therein, the services to be performed, the methods to be employed in performing them and the quality and production standards applicable thereto; to decide the number and location of its

plants and the closing down of the plant, or any part thereof; to alter, combine, transfer, assign or cease any job, department, operation or service; to decide the products to be manufactured, the work to be contracted out or purchased, including parts, components or assemblies and the required machinery and equipment; and to maintain safety, efficiency, order and compliance with federal and state regulation in and within the plants. It is further agreed that management maintains and retains all of its managerial rights and that they are vested solely and exclusively in the Company unless specifically contracted away by this Agreement.

## ARTICLE XI
## NO STRIKE

It is agreed that no officer or official of the Union or any of its locals shall assist or encourage and there shall be no picketing, company or product-derogation handbilling, supporting strikes, strikes, sit-downs, slow-downs, work stoppage, or any other activity which interferes with the Company's operations in the production, distribution, or sale of the products of the Company during the life of this Agreement. If any employee, or group of employees represented by the Union in this unit, should violate the intent of this paragraph, the Union shall take immediate affirmative action and use every means available to prevent such illegal acts and take all necessary steps to the end that work will be properly and orderly resumed. Violation of the provisions or intent of this paragraph shall be grounds for disciplinary action or discharge. The Company agrees that it will not lock out the employees during the life of this Agreement.

The agreement does not specify the duties of the inside laundry production employees. Article VI ("Wages"), Section 2 provides:

Job classifications (job titles) are listed for the purpose of determining the rates payable to the individuals, if any, who from time to time permanently occupy those classifications, and this listing shall

not be deemed to constitute any restriction upon the Company's rights under Article X hereof to create or discontinue classifications, to assign and reassign work, and to determine the number and abilities of employees required.

6. The operation of the Company's services entails a continual cycle of distributing laundered items and the retrieving of soiled items for cleaning and redistribution. The members of the Union are responsible for the sorting, washing, mending, pressing, and bundling of the items brought in by the drivers.

7. Soiled linen, which is contained in laundry bags and wheeled baskets (also referred to as hampers or trucks), is unloaded from trucks in the receiving area by the route drivers or servicemen. The soiled linen in the wheeled baskets is taken directly to the "wash floor" area for laundering. The bagged soiled linen is then placed on conveyors by the receiving and taken to the "soil sort" area for counting and sorting. The sorted linens are then put on another conveyor with hampers along the side. The receivers check to see that the contents of the hampers are kept at a low level and they replace the hampers if necessary. The receivers then use the hampers to transport the soiled linens to the "wash floor" area where they are laundered. After the linen has been washed, it is finished (i.e., dried and ironed). The finished linen is then transported to the "load make-up" area where it is put in bags, baskets, or hangers or wrapped. It is then moved to the "staging" area for loading onto trucks for delivery to customers.

8. In the spring of 1982, Calvin Armstrong, an inside laundry production employee, was told by his supervisor, Francis Griffin, to unload a truck from the Springfield branch containing "late soil" (soiled linen which is picked up later than usual and requires special handling so that it can be returned to the customer) because the driver of the truck was the Springfield branch manager. Washroom and Receiving Supervisor Griffin left the receiving

area. When he returned, he discovered that Armstrong had not unloaded the truck. Supervisor Griffin asked why the truck had not been unloaded, and Armstrong replied that he had been told by the Union not to unload trucks. Supervisor Griffin issued a verbal warning to Armstrong, telling him that the next time he was instructed to unload a truck, he would have to do it or he would be terminated.

9. The union steward, Josephine Odom, was advised of the statement of the supervisor and a meeting was held at the Company's plant. Roy Suarez represented the Union at the meeting while the Company was represented by Scott Morgan. Suarez explained to Morgan that the Union had been advised by the Teamsters that the loading and unloading of trucks was their jurisdiction and that they did not want members of the Union on the trucks. Morgan informed Suarez that he would keep the members of the Union from unloading the trucks. Morgan testified at trial, however, that he did not guarantee that Union members would not be expected to unload the trucks in occasional emergencies. Odom and Suarez testified that the purpose of the meeting was to reiterate a long-standing practice in the plant and industry custom that the loading and unloading of trucks was to be performed by the Teamsters.

10. It was and remained the position of the Union that its members were not to unload the trucks, and Suarez, Smith, and Odom instructed the members accordingly.

11. There was at the time this dispute arose an agreement between the Union and the Teamsters that loading and unloading of trucks was the exclusive jurisdiction of the Teamsters. The established practice in the linen industry for many years had been that the loading and unloading of trucks was Teamster work. This was also the ordinary practice at the Company's facility and in the years preceding the incidents giving rise to this action. Union members had on occasion assisted in unloading trucks and had on occasion refused to help unload trucks.

12. On February 24, 1983, Armstrong was working with another inside laundry production employee, Barbara Mason, when a truck loaded with twelve hampers of rags arrived at the facility. The truck was driven by a company mechanic. The Company wanted these rags unloaded so they could be cleaned and bundled for immediate delivery to a customer. Supervisor Griffin instructed Mason to unload the hampers and Mason began unloading the hampers. When Griffin returned to the area, only one hamper had been unloaded from the truck. Griffin asked Mason why she had not unloaded the rest of the hampers. Mason replied that an employee told her not to unload the truck. Griffin ordered her to unload the truck or face termination. Mason agreed to unload the truck. Griffin told Armstrong to help Mason. Armstrong refused. Griffin repeated the order and Armstrong again refused. Mason left the area to get shop steward Odom. Griffin and Armstrong went to the office whereupon Griffin discharged Armstrong in the presence of Odom. Both Armstrong and Odom told Griffin that Union officials had instructed them not to load or unload trucks and this was the reason Armstrong refused to unload the truck. The refusal of inside laundry production employees to unload the truck caused a delay in the processing of the soiled linen of one or two hours at most.

13. Calvin Armstrong filed a grievance which was submitted to arbitration. The arbitrator awarded Armstrong reinstatement with full backpay, including fringe benefit contributions, which totalled $9,009.77.

14. The Company incurred $2,779.06 in costs and attorneys' fees in arbitrating Armstrong's grievance.

### Conclusions of Law

1. This action is for an alleged breach of a collective bargaining agreement arising under and jurisdiction is conferred on the Court by Section 301 of the Labor Management Relations Act (LMRA) of

1947, as amended, 29 U.S.C. § 185 and under 28 U.S.C. §§ 1331 and 1337.

2. The Company is an employer within the meaning of Section 2(2) of the LMRA, 29 U.S.C. § 152(2) and is engaged in an industry which affects commerce within the meaning of Section 2(6) and (7) of the LMRA, 29 U.S.C. § 152(6) and (7).

3. The Union is a labor organization within the meaning of Section 2(5) of the LMRA, 29 U.S.C. § 152(5).

■ 4. The specific terms of the collective bargaining agreement do not detail the duties of the members of the Union as to the loading and unloading of trucks. The parties further dispute the terms of an oral agreement arising out of the meeting between representatives of the Union and the Company after the first incident involving Calvin Armstrong in the spring of 1982. "In interpreting a collective bargaining agreement it is often necessary to go outside the four corners of the contract itself and examine the agreement history to ascertain the intent of the agreement and determine the rights and duties of the parties." *International Union, United Auto., Aerospace and Agr. Implement Workers of America v. White Motor Corp.*, 505 F.2d 1193, 1197 (8th Cir.1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975); *see also Barrett v. Safeway Stores, Inc.*, 538 F.2d 1311, 1313 n. 2 (8th Cir.1976) ("a dispute under § 301 is governed by federal substantive law, *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957), 'and construed with reference to the particular practices, background and millieu which give rise to its use' ") (citation omitted). The Court finds, in light of past practice in the Company's facility, the Union's consistent, long-standing and well-known policy, custom within the industry, as well as the testimony of the witnesses, that the Company could not properly require members of the Union to unload trucks under the collective bargaining agreement.

■ 5. The substance of the Company's claim for damages in this action is the amount of money the Company spent pursuing and losing the arbitration of Armstrong's grievance. Assuming, for the sake of argument, that there is merit to the Company's claim that the Union violated the contract, the Court has great difficulty accepting the Company's claim that the Union caused the Company's loss in regard to the Armstrong arbitration.

6. The Union challenged the Company's decision to terminate Armstrong, insisted upon his reinstatement and, when the Company refused, pursued the grievance to arbitration. The arbitrator decided in favor of the Union and ordered the Company to reinstate Armstrong with backpay. The Court finds it inconsistent to hold the Union financially responsible for losses incurred by the Company because the Company refused to accept the Union's position. Such a result in these circumstances would operate to penalize a labor union for aggressively representing the interests of its members and, therefore, run contrary to the goals of the national labor policy. *See Anderson v. Alpha Portland Industries, Inc.*, 727 F.2d 177, 181 (8th Cir.1984) (en banc) ("a union's duty of fair representation arises from its status as exclusive representative of the employees within the bargaining unit, which deprives individual employees of the ability to deal directly with their employer.")

7. The only other damages allegedly suffered by the Company would have resulted from the one or two-hour delay in unloading the truck caused by Armstrong's refusal to unload. That the Company in fact suffered a loss because of the delay was not proven at trial.