**COLLINS COURT MUSIC, INC., et al., Plaintiffs,**

v.

**Melvin PULLEY, et al., Defendants.**

**No. 87–3529–CV–S–2.**

United States District Court,
W.D. Missouri, S.D.

Sept. 20, 1988.

Gregg Lombardi, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiffs.

Gary Lynch, Douglas, Lynch, Munton & Haun, P.C., Bolivar, Mo., for defendants.

COLLINSON, Senior District Judge.

### I–A

■ The facts leading up to this dispute are without controversy. Indeed, virtually all of the pertinent facts have been stipulated to by the parties in the *Stipulation of Uncontested Fact* filed June 29, 1988 (D.O.C. #38). Those stipulations have been reviewed by the Court and are hereby incorporated into this opinion by reference. Other facts offered by plaintiffs in their motion for summary judgment are set out in the affidavits of Kenneth Ayden, David Hochman, and Lloyd Reedstrom.[1]

"Congress granted owners of copyrighted musical works exclusive rights to publicly perform their copyrighted compositions. *See* 17 U.S.C. § 106(4)." *Van Halen Music v. Palmer*, 626 F.Supp. 1163 (W.D.Ark. 1986). In order to establish a *prima facie* case for infringement of copyright in musical compositions, a plaintiff must prove the following five elements:

(1) the originality and authorship of the compositions involved;

(2) compliance with all formalities required to secure a copyright under Title 17, United States Code;

(3) that plaintiffs are the proprietors of the copyrights of the compositions involved in this action;

(4) that the compositions were performed publicly for profit [by the defendants]; and

(5) that the defendants had not received permission from any of the plaintiffs or their representatives for such performance.

*Van Halen Music*, 626 F.Supp. at 1165.

A *prima facie* case as to the first three elements may be made by submitting certified copies of copyright registration certificates and any subsequent assignments. *Fourth Floor Music, Inc. v. Der Place, Inc.*, 572 F.Supp. 41, 43 (D.Neb.1983); *Remick Music Corp. v. Interstate Hotel Co.*, 58 F.Supp. 523, 531 (D.Neb.1944), *aff'd*, 157 F.2d 744 (8th Cir.1946), *cert. denied*, 329 U.S. 809, 67 S.Ct. 622, 91 L.Ed. 691 (1947) *reh'g denied*, 330 U.S. 854, 67 S.Ct. 769, 91 L.Ed. 1296 (1947). Copies of the certificates of copyright registration for each of the musical compositions at issue in this matter are attached to the plaintiffs' Motion for Summary Judgment as Exhibit 2. Paragraph 33 of the *Stipulation* reads: "[c]opies of plaintiffs' respective copyright certificates shall be deemed to be originals."

In considering plaintiffs' motion for summary judgment, we note that Rule 56 of the Federal Rules of Civil Procedure requires that there must be no genuine issue of any material fact, and the moving party must be entitled to judgment as a matter of law. *Ozark Air Lines, Inc. v. Air Line Pilots Assn'n., Intern.*, 577 F.Supp. 487 (1983), *aff'd*, 744 F.2d 1347 (8th Cir.1984), *on reh'g*, 761 F.2d 1259 (8th Cir.1985), *cert. denied*, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 231 (1985). The Court in making its determination must view the facts in the light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences to be drawn from the facts. *Howard v. Russell Stover Can-*

---

1. Mr. Ayden is a professional musician employed by ASCAP and acts as a supervisor in the Recording and Transcription Division of ASCAP's Performance Analysis Department. Mr. Hochman is ASCAP's Director of Radio Licens-

ing. Mr. Reedstrom is employed by ASCAP from time to time to make recordings of the broadcasts of certain radio stations that are suspected of copyright violations.

*dies, Inc.*, 649 F.2d 620 (8th Cir.1981). It is an extreme remedy and not to be granted unless the "movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Bellflower v. Pennise*, 548 F.2d 776, 777 (8th Cir. 1977). We note, however, that summary judgment may well be appropriate in this type of case. *See, e.g., Van Halen Music, supra; Fourth Floor Music, Inc., supra; KECA Music, Inc. v. Dingus McGee's Co.*, 432 F.Supp. 72 (W.D.Mo.1977).

As stated above, the Court has found that the first three elements of the five-element test to establish a *prima facie* case for infringement of copyright in music cases have been proven. Based upon the pleadings, affidavits, depositions, and stipulations submitted to the Court, we find that there is no genuine issue as to any material fact relating to the other two elements of the test and that they have likewise been proven, thereby establishing plaintiffs' *prima facie* case. Furthermore, the Court finds that the defendants have not demonstrated that a triable issue of fact exists. Once the moving party has sufficiently supported its motion for summary judgment, the opposing party must come forward with significant probative evidence demonstrating the existence of a triable issue of fact. *American Viking Contractors, Inc. v. Scribner Equipment Co., Inc.*, 745 F.2d 1365 (11th Cir.1984).

*Proof of Public Performance.* On March 5, 1987, Lloyd Reedstrom went to Bolivar, Missouri and recorded eight hours of the broadcasts of KYOO–AM between the hours of 9:00 a.m. and 6:15 p.m. that day. Affidavit of Lloyd Reedstrom ¶ 2–3. Those tape recordings contained performances of each of the musical compositions related to this suit. Ayden Affidavit at ¶ 6. The Pulleys have not contested the fact, by statement or other evidence, that the compositions were performed publicly by the station. Rather, they have stipulated that they "have no knowledge as to whether the musical compositions listed in Column 3 [of Schedule A attached to plaintiffs' complaint] were performed by the Stations on

March 5, 1987." *Stipulation* at paragraph 25.

*No Permission for Such Performance.* To legally publicly perform copyrighted musical material one must either obtain permission to do so from the owner(s) of the copyrights or from the owner's representatives. Though sometimes permission is granted gratuitously, more typically a licensing fee is negotiated and paid to the owner or an association like ASCAP or Broadcast Music, Inc. (BMI). In the matter at hand, "[a]t no time have the Pulleys attempted to directly contact any of the individual plaintiffs in this matter to obtain their permission to broadcast, on the Stations, musical compositions for which plaintiffs own the copyrights." *Stipulation* at ¶ 19.

With regard to licenses, "[f]rom 1979 *through December 31, 1986*, the Pulleys had an ASCAP license, which authorized them to broadcast on the Stations the copyrighted musical compositions owned by the plaintiffs in this matter. The Pulleys kept possession of these licenses in the course of regularly conducted business activity at the Stations." *Stipulation* at ¶ 15. (Emphasis added). "As per the licensing agreements, Melvin Pulley submitted reporting forms for the Stations to ASCAP for 1983, 1984, 1985 and 1986. These forms were prepared by Melvin Pulley in the course of regularly conducted business activity at the Stations." *Stipulation* at ¶ 16. During that same period, January 1, 1983 through December 31, 1986, the defendants tendered to ASCAP several small payments totaling $1,791.06. The defendants also paid $100.00 on May 20, 1987 and *offered* a $101.00 payment on June 9, 1987 as "payment in full" for all amounts due by the Pulleys. This last payment was rejected as such by ASCAP. *Stipulation* ¶ 22. Though there was and still is a dispute as to the precise amount owed by the Pulleys to ASCAP, it is clear to the Court that whether *some* amount was in arrears as of December 31, 1986 cannot seriously be disputed, despite the defendants' attempts to do so in their Suggestions in Opposition filed July 13, 1988. In fact, the Pulleys

previously admitted that they owed ASCAP license fees at the time their license expired on December 31, 1986.

In Mr. Pulley's deposition he admitted that, as of September 29, 1986, the stations owed ASCAP between $320–$450. He further admitted that the radio stations paid ASCAP only $60 between that date and May 20, 1987; $30 on September 30, 1986, and $30 on October 25, 1986. *Deposition of Melvin Pulley* at 152–153, *Stipulation* at ¶ 22. When Mrs. Pulley, who acted as bookkeeper of the stations, was asked at her deposition why she thought that the amount that the stations owed ASCAP was less than what the statements from AS-CAP indicated, the only reason offered was that the amount on the statement "was more money than we had." *Deposition of Gretchen Pulley* at 94–96.

The Court agrees with the plaintiffs' legal argument that defendants cannot create a *genuine* issue of fact merely by making statements, or pleadings, inconsistent with their prior sworn testimony. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365–66 (8th Cir.1983).

In short, it is not disputable that the Pulleys owed ASCAP money when their license was terminated. Furthermore, the Pulleys were warned, by letter dated September 19, 1986, that their license would be terminated on December 31, 1986 if they remained in arrears. They also received a certified letter from ASCAP dated January 14, 1987 which informed them that "your stations are not licensed to perform copyrighted musical compositions in the ASCAP repertory. Any such performances without advance written permission from the ASCAP members in interest will constitute infringements of copyright." It is stipulated that these two letters were among documents produced from the Pulleys' files and were kept in the course of the regularly conducted business of the Stations. *Stipulation* at ¶ 20(d) and 20(e). Thus, it is clear that part five of the five-element test has been met, *i.e.*, that the defendants performed the compositions in question on March 5, 1987 without the owners' permission.

Accordingly, plaintiffs have established a *prima facie* case for music copyright infringement.

### I–B

In their response to plaintiffs' summary judgment motion, the defendants fail to put material factual issues in dispute. Rather, their response is more in the nature of a two-part affirmative defense: ASCAP "had to" license the Stations, and, if ASCAP wrongfully refused to grant a license, then the individual members should be stopped from asserting a copyright violation.

■ Both of these assertions are assertions of law, not fact. With regard to the former assertion, that ASCAP "had to" license the stations, we note that ASCAP's licensing activities are regulated, generally, by a Consent Decree entered in an antitrust action captioned *United States v. AS-CAP*, Civil Action No. 13–95 (S.D.N.Y.) It is true that Section IV–C of the Amended Final Judgment in that case requires AS-CAP to offer uniform license agreements to all similarly situated music users in a non-discriminatory manner. Furthermore, Sections VI and IX of that Judgment require ASCAP to grant a license to any user who requests one, and to quote what it deems to be a reasonable fee for such a license.

The terms of the Consent Decree have resulted in music users and ASCAP conducting industry-wide negotiations for licenses in the context of rate proceedings. In the case of the radio industry, for many years now their license terms and fees have been negotiated by ASCAP and the All–Industry Radio Music License Committee (the "Committee"). In every instance, an agreement between the parties has been reached. Never has the radio license fee had to have been determined by the district court of the Southern District of New York. Once an agreement has been reached, the agreements have been submitted to the district judge for approval as being reasonable and non-discriminatory. The most recent rate proceeding for radio license fees was in *In the Matter of the Application of WGN of California, Inc.*,

*et al.* Paragraph five of the *WGN Order,* a passage cited by the *defendants* in their response to the plaintiffs' motion for summary judgment, reads as follows:

> The provisions of this order shall not be construed as directing ASCAP to enter into any license agreement with any petitioner who, under the interim order herein or under prior license agreements, (a) indisputably owes *any* license fees to ASCAP, or (b) is in default in the submission of reports, or (c) has submitted such reports but failed to pay the license fees set forth therein, provided however, that if any petitioner, within forty-five (45) days after written demand by ASCAP, shall make payment of all such license fees, and shall submit all such reports, then upon application ASCAP shall offer, within a reasonable time thereafter, a license agreement to such petitioner in accordance with Paragraphs "1" and "2" of this order, and provided that ASCAP may apply upon notice to this Court for other or further relief as to petitioners who have not made payment of all such license fees indisputably owing, and submitted all such reports within such forty-five (45) day-period.

*WGN Order,* Paragraph 5 (emphasis added).

After the license fee agreements have been approved by the Court, ASCAP makes the agreements available to every radio station in the country, whether they joined in the petition with the Committee members or not, *with the exception of those stations who continue to owe license fees under prior agreements or extensions of prior agreements,* all in accordance with the provisions of the *WGN Final Order. See Hochman Affidavit in Support of Motion for Summary Judgment* attached as Exhibit 4 thereto.

To this Court, it is clear from the provisions of the *WGN Order* and prior orders in earlier rate proceedings that ASCAP is under no obligation to make license agreements available to any station that owes fees for earlier licensed periods.

With regard to the last assertion made by the defendants in their suggestions in opposition to the summary judgment motion, that if ASCAP wrongfully refused to grant licenses then the plaintiffs should be stopped from asserting a copyright violation, the Court notes that the defendants have cited no authority supporting such a theory, however reasonable the theory sounds. However, even if such a legal theory were correct and applicable, this Court would find as a matter of law that ASCAP has not *wrongfully* refused to grant a license. As stated above, this Court finds that it is not *genuinely* disputed that the defendants owed some amount of license fees at the time their license agreement expired on December 31, 1986. After examining and considering paragraph 5 of the *WGN Order,* the most reasonable legal conclusion this Court can draw is that ASCAP's decision to not grant a new license to the defendants was not "wrongful."

In summary, this Court finds that the defendants, in their answer, response to the motion for summary judgment, and all other pleadings, have done nothing to put any *material* fact in dispute.

What *is* in dispute is the precise amount of the defendants' arrearage as of December 31, 1986. The plaintiffs have offered compelling assertions that the defendants, as of that date, had not paid all of the license fees due based on the annual reports submitted by the defendants. Furthermore, the plaintiffs have also offered evidence that seems to strongly suggest that the defendants have understated their income and overstated their entitled deductions in their annual reports to ASCAP. However, this practice has been disputed by the defendants so it is therefore inappropriate for this Court, when ruling on a motion for summary judgment, to take such information into account. As the plaintiffs have requested a relatively large amount in damages under the statute in order to insure that these defendants and like-minded individuals elsewhere have no economic incentive to cheat on their license fee payments, it will be necessary for this Court to determine exactly how much in fees the defendants wrongfully did not

pay. This, however, will constitute a finding of fact so therefore the Court cannot grant a complete summary judgment in today's order. However, as stated above, since the Court finds that it is clear that the plaintiffs were within their rights in refusing to extend a new license to the defendants and since it is clear that the defendants publicly aired the musical compositions in question after the expiration of their license agreement, then this Court has no trouble in granting a summary judgment against the defendants with a hearing to be held in the future to determine proper damages.

## II–LIABILITY

■ The plaintiffs seek to impose liability on both Mr. Pulley and Mrs. Pulley. It is well established that "one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." The imposition of liability on a controlling individual is based upon the belief that the individual is in a position to control the conduct of the entity which is the "primary" infringer. (citations omitted).

*Van Halen Music, supra* at 1167, citing *Fourth Floor Music, supra* at 43. Vicarious liability may even be imposed on a controlling individual who has no knowledge of infringement. *Boz Scaggs Music v. KND Corporation,* 491 F.Supp. 908, 914 (D.C.Conn.1980). However, in *Van Halen Music,* the Court held that the wife of one of the principals, though she was secretary of the corporation, had duties that were entirely administrative and that she exercised no significant control over the closed operation. In that situation, that Court felt there was no basis for imposing joint liability on her.

However, we believe that in the case at hand, Mrs. Pulley, unlike Ms. Palmer in *Van Halen Music v. Palmer,* should be held jointly and severally liable. It has been stipulated that both the Pulleys own the radio stations KYOO–AM and KYOO–FM, the stations involved in this case. Ownership is through a partnership under which Melvin Pope and Gretchen Pulley each owned 50% of the stations. *Stipulation* at paragraph 2. Furthermore, "[t]he Pulleys have primary responsibility for the control, management, operation and maintenance of the Stations. They both participate in management decisions as to how the Stations are operated, and the kind of music which the Stations play." *Stipulations* at paragraph 4. Thus, Mrs. Pulley, in addition to her administrative duties as the bookkeeper of the stations, also was an equal owner of the Station and shared management responsibilities with her husband. Therefore, the Court finds that in this case it would be appropriate for imposing joint liability on both Mr. and Mrs. Pulley.

## III–RELIEF

A. *Injunctive Relief.* Under 17 U.S.C. § 502(a), "Any court having jurisdiction of a civil action arising under this Title may … grant … final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." Having concluded that the defendants infringed on the copyrights in the twenty compositions listed above, the Court will enjoin the defendants from any further infringement of those works. *Van Halen Music, supra,* at 1167. However, the Court will withhold imposing the injunction until some date after the impending evidentiary hearing. Should the defendants wish to offer evidence and/or arguments considering the inappropriateness of this Court entering the injunction, they should present same at the time of the evidentiary hearing.

B. *Monetary Damages.* By their prayer for relief, plaintiffs have elected to recover statutory damages which the Court may impose in the amount it considers just. 17 U.S.C. § 504(c)(1). Statutory damages may range from $250 to $10,000 for *each* incident of infringement. Furthermore, the Act further provides that if the Court finds infringements to be willful, it may award up to $50,000 for infringement. 17 U.S.C. § 504(c)(2).

For the reasons set out above, this Court chooses not to award statutory damages at this time, but rather will order an evidentiary hearing for the purpose of determining the precise amount of fees owed and not paid by the defendants as well as considering the matter of whether the defendants' conduct was "willful" within the meaning of the Act.

C. *Attorney's Fees.* In regard to the recovery of attorney's fees this Court notes, as did the Court in *Van Halen Music,* the factors cited in *Boz Scaggs Music, supra,* at 915, which may justify *denial* of reasonable attorney's fees:

(1) The presence of a complex or novel issue of law litigated by the defendants in good faith;

(2) Defendants' status as innocent rather than willful or knowing infringers;

(3) Bad faith on plaintiffs' part in prosecuting the action; or

(4) A good faith attempt by the defendants to avoid infringement.

Today the Court will withhold judgment on whether to grant attorney's fees until after the evidentiary hearing.

Accordingly, it is hereby

ORDERED that the plaintiffs' motion for summary judgment, subject to the limitations and provisions of this order, is hereby granted. Further

ORDERED that an evidentiary hearing is hereby set for Monday, October 3, 1988, at 9:30 a.m. for the purpose of the parties offering evidence relating to the issue of a proper amount of statutory damages to be awarded by the Court as more fully discussed by this Court above. Further

ORDERED that at said hearing the Court will hear evidence as to the breadth of injunctive relief to be granted the plaintiffs. Further

ORDERED that the defendants will be given the opportunity to present evidence showing why attorney's fees should not be granted the plaintiffs herein.